# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

| | |
|---|---|
| MARK LEVESQUE, CHRISTIE DECKER, MICHAEL PLATT, SYLVIA KRAININ, and SALLY TRUSSELL,<br><br>              Plaintiffs<br><br>v.<br><br>IBERDROLA, S.A., CENTRAL MAINE POWER COMPANY, AVANGRID, INC., and DOUGLAS HERLING, of Bowdoin, Maine,<br><br>              Defendants | DOCKET NO. 2:19-cv-389-JDL |

## THIRD AMENDED COMPLAINT WITH JURY DEMAND

NOW COME the Plaintiffs, Mark Levesque, Christie Decker, Michael Platt, Sylvia Krainin, and Sally Trussell (collectively, "the Named Plaintiffs"), by and through their counsel, and allege the following on behalf of themselves and those similarly situated.

## <u>INTRODUCTION</u>

1.      This case is about the hundreds of thousands of Maine residents who have been harmed by Iberdrola, S.A.'s, Central Maine Power Company's, and Avangrid, Inc.'s (collectively, "the corporate defendants")[1] implementation of a defective metering and billing system that incorrectly measured and charged their customers for power delivered and the Defendants' attempts to cover up the problems that resulted from their implementation of this defective system.

---

[1] Plaintiffs reserve the right to add additional parties to this matter, including the addition of defendants as they learn who had knowledge of the fraudulent scheme alleged in this Complaint.

2. CMP is a business corporation headquartered in Augusta, Maine. It is an electric utility with Maine Charter Number 19050014D.

3. CMP transmits and delivers electricity that is generated by various power suppliers to more than 624,000 customers in an 11,000 square-mile service area in central and southern Maine.

4. CMP is currently a subsidiary of Avangrid, Inc. ("Avangrid"). Avangrid is a New York corporation headquartered in Connecticut. It is registered in Maine with the noted former names of Iberdrola, USA, Inc. and Energy East Corporation. *See Exhibit 1,* ME. DEPT. OF THE SEC. OF STATE, Corporate Name Search, Avangrid, Inc. (Doc. 16-19).

5. Iberdrola S.A. ("Iberdrola") is a corporation organized under the laws of the Kingdom of Spain. It directly owns 81.5% of outstanding shares of Avangrid common stock and exercises significant influence over Avangrid's, and therefore CMP's, business policies and decisions.

6. Beginning in or about 2011, the corporate defendants introduced a system of "smart meters" that were designed to measure CMP customers' use of electricity and transmit measurements remotely in order to dispense with the need for regular meter readings by CMP personnel.

7. In October 2017, the corporate defendants switched CMP from its 27-year-old mainframe computer to a new "SmartCare" Meter and Billing System, which was designed to interface with the smart meters, and, almost immediately, trouble began.

8. Beginning the following month, as a result of SmartCare system issues, approximately 97,000 CMP customers saw their bills increase by 50% or more, without any actual increased use of electricity on their part. Some saw their bills double or even triple, which was

financially devastating for many customers. Another approximately 200,000 CMP customers have been overcharged by up to 50%.

9.      The corporate defendants knew that the persistent problems with the newly integrated SmartCare system produced many inaccurate bills that resulted in significant overcharges to customers.

10.     Despite their knowledge that many bills were inaccurate, the corporate defendants caused incorrect bills to be sent to customers.

11.     The incorrect bills CMP caused to be sent to customers were misrepresentations because they charged customers for kilowatt hour usage that the customer did not consume.

12.     Incorrect statements made by CMP customer service employees to CMP customers were misrepresentations because they provided material information about customer's bills that was false.

13.     Correspondence by CMP's Chief Executive Officer, Douglas Herling, stating that CMP metering and billing figures are accurate were misrepresentations because they provide material information about customer's bills that was false.

14.     Despite receiving thousands of customer complaints and knowing from the beginning that the SmartCare system was inaccurate and that the meters were malfunctioning, the corporate defendants did not resolve the problems and did not reimburse customers the money that CMP improperly collected.

15.     A large number of CMP customers utilize a direct debit system, whereby bill amounts are automatically debited from their bank accounts each month.

16.     The corporate defendants caused incorrect payments to be drawn from these customers' bank accounts, effectively depriving the customers of their money without their consent, many times without the customer even being aware of the fraudulent taking.

17.     The corporate defendants continued to issue and send out bills, despite knowing of the defective and inaccurate performance of the system.

18.     Many customers were sent or threatened with disconnection notices if they did not (or could not) pay the inaccurate bills.

19.     During this same timeframe, the corporate defendants began the systematic practice of intentionally misrepresenting to customers and the public that the new SmartCare system and meters were not the cause of the outrageously high bills, including blaming the customer for the high bills.

20.     Douglas Herling, President and Chief Executive Officer of CMP and executive officer of Avangrid, has issued a number of statements to CMP customers asserting that all systems from meters to bills are working correctly and all bills are accurate, although he knew when he made the assertions that they were false.

21.     Customers relied on the misrepresentations of the defendants that the bills were accurate and that the SmartCare system was working correctly.

22.     Customers relied on the misrepresentations of the corporate defendants that the high bills were the fault of the customers.

23.     Customers relied on the misrepresentations of the defendants, including statements, correspondence, bills, and those customer service representatives that the billing and metering figures were accurate and therefore the fault of the customers and that the SmartCare system was working correctly in making their decision to pay towards incorrect bills.

24.     Hundreds of thousands of customers have been damaged as a result of the defendants' actions.

25.     Common examples of these damages include, but are not limited to, payment for power, transmission and delivery charges that were for power that was not used by customers;

paying bills that were inaccurate in reliance on the misrepresentations of the defendants; paying for electricians to assess their homes' issues and power usage; buying new appliances based on the false assertion that they were the cause of the increased bills; loss of or damage to personal property; traveling to the residence in question to observe CMP's meter testing; and emotional distress arising from fear of inability to pay such bills and fear of termination of electric service caused by defendants' issuance of disconnection notices.

26.     This action is to recover the damages incurred by many thousands of CMP customers as a result of Iberdrola's, CMP's, Avangrid's and Douglas Herling's continued use of the defective SmartCare system and for their fraudulent misrepresentations to their customers.

## PARTIES

*Putative Plaintiffs*

27.     Mark Levesque is a resident of Scarborough in Cumberland County, Maine.

28.     Christie Decker is a resident of Wilton in Franklin County, Maine.

29.     Michael Platt is a resident of Corinna in Penobscot County, Maine.

30.     Sylvia Krainin owns a joint interest in a house in Naples in Cumberland County, Maine.

31.     Sally Trussell owns a home in Scarborough in Cumberland County, Maine.

*Defendants*

32.     Central Maine Power Company is located at 83 Edison Drive, Augusta, Maine.

33.     Douglas Herling is the President and Chief Executive Officer ("CEO") of CMP and an executive officer of Avangrid, and is an individual resident of Bowdoin, Maine.

34.     Avangrid, Inc. is located at 180 Marsh Hill Road, Orange, Connecticut.

35.     Iberdrola, S.A. is a corporation organized under the laws of the Kingdom of Spain and directly owns 81.5% of outstanding shares of Avangrid common stock.

## JURISDICTION AND VENUE

36.     Prior to removal, Maine Superior Court had jurisdiction over this action under 4 M.R.S. § 105(1), and venue was appropriate under 14 M.R.S. § 501 because Levesque resides in Cumberland County, which is also where a substantial part of the events giving rise to the claims occurred.

37.     This Court has original jurisdiction over this action under 28 U.S.C. § 1331 because one of the claims against the corporate defendants arises under the laws of the United States, specifically, the Racketeering Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1961, et seq.  The Court has supplemental jurisdiction over the other claims pursuant to 28 U.S.C. § 1367 because those claims arise out of the same set of operative facts as claims made pursuant to the RICO claims.

38.     The United States District Court for the District of Maine is the federal judicial district in which the Plaintiffs filed this suit.  Venue is therefore proper pursuant to 28 U.S.C. §§ 99 and 1441(a).

## FACTUAL ALLEGATIONS

*Iberdrola, Avangrid, and CMP: An Association-In-Fact Enterprise*

39.     CMP is a transmission and distribution utility that transmits and distributes electricity to more than 600,000 customers in central and southern Maine. *See Exhibit 2,* Central Maine Power, Company Overview (Doc. 16-20).

40.     In or about 1999, the Energy East Corporation acquired CMP and kept its adopted name, Central Maine Power.

41.     In or about 2008, Iberdrola, S.A. (again, "Iberdrola"), acquired Energy East and all of its subsidiaries, including CMP. *See Exhibit 3,* Avangrid, Inc., 2018 10-K Form[2] at pg. 7. (Doc. 16-21).

42.     At or around the time Iberdrola acquired Energy East, meetings were held in the New Gloucester, Maine Energy East corporate offices with representatives from Iberdrola's home office in Spain.

43.     Jose Ignacio Sanchez Galan, believed to be the Chief Executive Officer at Iberdrola, was present for some of these Maine meetings.

44.     Energy East and CMP employees were told by Iberdrola that Energy East was selling the company to Iberdrola, but employees were instructed that they were not to share this information outside of the company doors, as Iberdrola wanted to control the narrative.

45.     From the time that Iberdrola acquired Energy East moving forward, there was a continuous team of people in the New Gloucester, Maine corporate office from Iberdrola's home office in Spain.

46.     Employees were told that this "boots on the ground" approach was "the Iberdrola way."

47.     In or about 2009, Iberdrola changed Energy East's name to "Iberdrola, USA, Inc." *See Exhibit 3,* Avangrid, Inc., 2018 10-K Form at pg. 7.  (Doc. 16-21).

48.     The Iberdrola team instructed corporate office employees as to how the businesses, including CMP, should be run.

---

[2] A 10-K is a comprehensive report filed annually by a publicly traded company about its financial performance and is required by the U.S. Securities and Exchange Commission (SEC).

49.     All of the regulated assets, accounting for all investments, vendor payments, payroll, and virtually everything involving money, was processed through the New Gloucester, Maine corporate office.

50.     In other words, CMP employees would not be paid unless approved by Iberdrola.

51.     CMP bills, vendor payments, etc., would not be paid or processed, unless approved by Iberdrola.

52.     There was an approval process in place, whereby upper management at Iberdrola had to approve all monetary requests.

53.     In or about 2010, Iberdrola, USA sold a number of its non-Maine based subsidiaries to United Illuminating Holdings Corporation ("UIL"). *See Exhibit 3,* Avangrid, Inc., 2018 10-K Form at pg. 7.  (Doc. 16-21).

54.     In 2015, Iberdrola USA acquired UIL and essentially repurchased the subsidiaries it had sold to UIL in 2010. *See Exhibit 3,* Avangrid, Inc., 2018 10-K Form at pg. 7 (Doc. 16-21).

55.     Following the acquisition of UIL, Iberdrola USA (formerly Energy East while always maintaining the adopted name of CMP) was renamed Avangrid, Inc.

56.     On information and belief, this name change from Iberdrola USA to Avangrid was to distance the Avangrid brand from the bad press associated with the name Iberdrola, due in part to the issues that Scottish Power, another subsidiary wholly owned by Iberdrola, was grappling with as a result of its rollout of a new billing system, which resulted in withheld and incorrect bills to customers, and to which there was a deficient customer service response. *See Exhibit 3,* Avangrid, Inc., 2018 10-K Form at pg. 7. (Doc. 16-21).

57.     Immediately following the completion of the acquisition, former UIL shareholders owned 18.5% of the outstanding shares of common stock of Avangrid, and Iberdrola, S.A. owned the remaining shares. *See Exhibit 3,* Avangrid, Inc., 2018 10-K Form at pg. 7. (Doc. 16-21).

58.     A graphic on CMP's website helps to explain the companies' name changes over the course of years:



*See Exhibit 2,* Central Maine Power, Company Overview (Doc. 16-20).

59.     Avangrid discloses in its 10-K that "***Iberdrola exercises significant influence over [Avangrid], and its interests may be different than [other shareholders]." See Exhibit 3,*** Avangrid, Inc., 2018 10-K Form at pg. 38 (emphasis in original) (Doc. 16-21).

60.     Avangrid's 10-K further discloses:

   a.  Iberdrola owns approximately 81.5% of outstanding shares of Avangrid's common stock and exercises significant influence over its business policies and affairs. *See Exhibit 3,* Avangrid, Inc., 2018 10-K Form at pg. 38 (Doc. 16-21).

   b.  Because of Iberdrola's ownership, the interests of Iberdrola may conflict with the interests of Avangrid's other shareholders. The example provided is: "Iberdrola may support certain long-term strategies or objectives for [Avangrid] that may not be accretive to shareholders in the short term." *See Exhibit 3,* Avangrid, Inc., 2018 10-K Form at pg. 38 (Doc. 16-21).

61.     Nothing changed from a corporate standpoint following the UIL acquisition and the subsequent name change to Avangrid. All matters and functions involving CMP billing and money continued to be processed through the New Gloucester, Maine office.

62.     Indeed, the employees working at New Gloucester, Maine knew no distinction between Iberdrola, S.A. and CMP/Energy East/Iberdrola, USA/Avangrid.

63.     If a New Gloucester Avangrid employee wanted to do anything, it was understood that Iberdrola needed to first sign off on the request.

64.     For example, in or about 2010, Iberdrola mandated that CMP accounting software be changed from what had been used in the past, to the accounting software that Iberdrola used.

65.     Iberdrola mandated another change in the CMP accounting software again in 2017.

66.     On information and belief, the change in accounting software in 2017 was mandated by Iberdrola because it was rolling out a new software for all of its companies.

67.     Iberdrola wanted a "global model," as it wanted one platform that its subsidiaries all over the world would use.

68.     This "global model" accounting software was implemented in Maine at the direction, and for the benefit, of Iberdrola.

*Iberdrola, Avangrid, and CMP implement the SmartCare Meter and Billing System*

69.     In October 2017, at the direction of Iberdrola and with the full cooperation of Avangrid, CMP implemented its new SmartCare Meter and Billing System (collectively referred to as "SmartCare").

70.     SmartCare was a massive software change for CMP, mandated by Iberdrola.

71.     The rollout of the SmartCare system in Maine was led by the development team and implementation team, which consisted mainly of employees from Iberdrola's Spanish offices, the Iberdrola employees placed in the New Gloucester office, Avangrid employees, CMP employees, and Maine Natural Gas employees, as well as representatives from other subsidiaries.

72.     On information and belief, the corporate defendants failed to adequately test the SmartCare system prior to the rollout, including but limited to conducting far fewer weeks of

testing than planned and recommended. *See Exhibit 4, CMP misled the public, mismanaged rollout of new billing system,* PORTLAND PRESS HERALD, June 23, 2019 (Doc. 16-22)*.*

73.     Almost immediately after the rollout, customers noticed a significant and inexplicable increase in their CMP bills.

74.     On information and belief, approximately 97,000 CMP customers saw one or more of their bills increase by 50% or more.

75.     On information and belief, another 200,000 CMP customers have been overcharged up to 50% on one or more of their bills.

76.      Of particular note, many CMP customers were left without power for many days after a massive storm on October 30, 2017, which one would expect would result in a <u>lower</u> electricity bill during that time period due to less usage rather than one that is astronomically higher.

77.     Upon information and belief, the effected customers had not altered their consumption materially to justify the increased bills, nor was there an increase in rates sufficient to support the increased bills.

78.     The common denominator for virtually all of the many thousands of inexplicably high bills was the rollout of the SmartCare system.

79.     The only logical explanation for the drastic increases in tens of thousands of customers' bills immediately following the rollout was a problem with the SmartCare system.

80.     Calls to the CMP customer service centers, which are located in Maine, Texas, Pennsylvania, and elsewhere, began to pour in.

81.     On information and belief, a poorly timed corporate employee buyout and reduction of customer service positions left CMP understaffed following the rollout. *See Exhibit 4,*

*CMP misled the public, mismanaged rollout of new billing system,* PORTLAND PRESS HERALD, June 23, 2019 (Doc. 16-22).

82.     Despite knowing that the bills were wrong and did not accurately reflect what customers owed, CMP Customer Service Representatives were instructed by the corporate defendants to tell CMP customers that the spike in their electricity bills was caused by the customer, for reasons including but by no means limited to the following:

- o There was a "cold snap" and therefore the customer's furnace must have been running more;
- o There must be bad wiring in the home;
- o There must be old and/or inefficient electrical appliances that were causing the bill increases;
- o If there were children in the home, it must be due to video game usage;
- o There must be inefficient heat or well pumps;
- o Space heaters must be causing the problem; and
- o Someone must be stealing the electricity.

83.     In some cases, CMP sent disconnect notices to customers who could not afford to pay the exorbitant and incorrect bills or who contested said bills, including some in contravention of established Maine Public Utilities Commission ("PUC") regulations.

84.     As a result of the increased bills and the misrepresentations by CMP customer service representatives that the bills were somehow the fault of the customer, customers suffered harm, including but not limited to, paying electricians to go to their homes to investigate what could possibly be causing the increased bills; purchasing new appliances; severely limiting their electricity usage; and paying incorrect bills on CMP's word that they were accurate and/or out of fear that their power would be disconnected.

85.     Many CMP customers felt and continue to feel that they have had to choose between paying erroneous and expensive bills and paying for medications and other healthcare needs, or other necessary or important expenditures.

86.     After lodging complaints with CMP, many customers simply stopped receiving electric bills at all.

87.     Some customers did not receive a bill for months at a time; others did not receive a bill for an entire year.

88.     Some customers were unable to access their online CMP account to review their account status, pay bills, or assess their purported usage and/or billing, through no fault of their own and/or due to CMP's flawed metering-billing system.

89.     Some of these same customers were sent disconnect notices, despite not receiving a bill.

90.     CMP has also placed customers on payment arrangements that were never agreed to by the customer.

91.     Some CMP customers had monies withdrawn from their bank accounts without their consent and/or knowledge.

92.     Some CMP customers have been sent to collections for the set aside amount, which is the difference between the overcharge and what they paid.

93.     Some CMP customers who had not received bills for many months suddenly received bills indicating that the entire amount was due and owing immediately, resulting in "bill shock."

94.     Some CMP customers have simply paid erroneously high bill without questioning them or disputing them with CMP, at least in part because customers expect CMP's representations about bills to be accurate.

95.     CMP knows that the bills it is sending to its customers are incorrect, yet it continues to do so.

96.     Many customers continue to pay the fraudulent bills for fear of losing their power.

97.     Complaints from customers regarding the incorrect bills continue to be lodged against CMP.

98.     On information and belief, in October 2018, Donna McNally, a veteran information technology director for CMP, told an audience of nearly 1,000 utility industry professionals during a software conference that CMP's new software system, launched in October 2017, had "increased billing accuracy and 'enhanced customer experience.'" *See Exhibit 4, CMP misled the public, mismanaged rollout of new billing system,* PORTLAND PRESS HERALD, June 23, 2019.  (Doc. 16-22).

*Iberdrola's previous billing issues: history repeats itself.*

99.     In 2014, Ofgem[3] (the UK's version of the Public Utility Commission) launched an investigation into Scottish Power's[4] new billing system (similar to the SmartCare system), customer complaint handling, and poor customer service. *See Exhibit 6, Customer billing scandal sees energy firm face ban,* DAILY MAIL; LONDON (UK), Nov. 15, 2014.  (Doc. 16-24).

100.    The investigation mimicked many of the issues that Maine citizens are presently facing, including that tens of thousands of customers were waiting for long overdue bills, putting them "at risk of suddenly being hit with a demand for a very large sum, so-called 'bill shock'." *See Exhibit 6, Customer billing scandal sees energy firm face ban,* DAILY MAIL; LONDON (UK), Nov. 15, 2014. (Doc. 16-24).

---

[3] "Ofgem is the Office of Gas and Electricity Markets. We are a non-ministerial government department and an independent National Regulatory Authority, recognised by EU Directives. Our principal objective when carrying out our functions is to protect the interests of existing and future electricity and gas consumers." *See Exhibit 5,* Ofgem, *Who we are*. (Doc. 16-23).

[4] As discussed above, "[i]n 2007, Iberdrola, S.A. acquired Scottish Power Ltd., or Scottish Power, including ScottishPower Holdings, Inc., or SPHI, the parent company of Scottish Power's U.S. subsidiaries." *See Exhibit 3,* Avangrid, Inc., 2018 10-K Form. (Doc. 16-21).

101.    Similar to the issues facing Maine CMP customers, the Scottish Power call centers were overwhelmed by complaints and failed to respond to consumers' issues. *See Exhibit 6, Customer billing scandal sees energy firm face ban,* DAILY MAIL; LONDON (UK), Nov. 15, 2014. (Doc. 16-24).

102.    Indeed, part of the reason that Iberdrola USA was renamed Avangrid in December 2015 was to get distance from the Scottish Power–related lawsuits against Iberdrola in the U.K.

103.    In 2016, Ofgem levied an 18M pound (approximately $20-25 million U.S. dollars) fine against Scottish Power, relating in part to the introduction of the new computer system. *See Exhibit 7, Poor Service cost Scottish Power Pounds 18m,* THE TIMES: LONDON (UK), Apr. 27, 2016 (Doc. 16-25); *Exhibit 8,* OFGEM DECISION, June 8, 2016 (Doc. 17).

104.    More than 300,000 people received late or incorrect bills as customers moved onto a new computer system. *See Exhibit 8,* OFGEM DECISION, June 8, 2016 (Doc. 17).

105.    Ofgem said that the company, owned by Iberdrola, had failed to treat customers fairly and did not respond properly to complaints and calls. "Scottish Power did not have sufficient resources in place to deal with all complaints in a timely manner," Ofgem said. "The delays were such that a significant number of customers gave up and abandoned their call." *See Exhibit 8,* OFGEM DECISION, June 8, 2016 (Doc. 17).

106.    Unlike CMP, Scottish Power apologized to its customers for the problems they experienced when the new billing system was implemented, and committed to "no customer [being] left out of pocket from [its] mistakes." *See Exhibit 9,* Neil Clitheroe, *Effects of new billing system*, SCOTTISHPOWER CEO BLOG (June 25, 2015) (Doc. 17-1).

*Overlap of Key Employees at Iberdrola/Avangrid/CMP*

107.    Vicky Kelsall was the Vice President of Customer Service at Scottish Power when its new billing system went online in 2013. *See Exhibit 10, Corporate Governance: Group Structure*, IBERDROLA (DOC. 17-2); *Exhibit 11,* Resume of Vicky Kelsall (Doc. 17-3).

108.    Ms. Kelsall played an integral role in handling the issues that Scottish Power faced when it rolled out its new IT system, resulting in problems that mirror those associated with the SmartCare system in Maine.

109.    Ms. Kelsall transferred to Avangrid in January 2018, where she is now the Vice President of Customer Service, Billing and Collections, and other areas. *See Exhibit 11,* Resume of Vicky Kelsall at "Work History" (Doc. 17-3).

110.    Avangrid's 10-K filing also details the nearly 35 years of experience (beginning in 1985) that Douglas Herling, the current President and Chief Executive Officer of CMP, effective January 2, 2018, has spent at Iberdrola, Avangrid, and CMP. *Exhibit 3*, Avangrid, Inc., 2018 10-K Form at pg. 41 (Doc. 16-21).

111.    Avangrid's 10-K filing states that Douglas A. Herling has functional responsibility for Avangrid's electrical operations; he previously served as Networks[5] vice president – electric operations from 2016 to 2017; and from 2001 to 2016, held various executive management positions at Avangrid Networks and CMP, including (a) vice president – special projects, (b) vice

---

[5] Avangrid has two primary lines of business: Avangrid Networks and Avangrid Renewables, as demonstrated below:



*See Exhibit 3,* Avangrid, Inc., 2018 10-K Form at pg. 6 (Doc. 16-21).

president – engineering & asset management, and (c) engineering and vice president of CMP field operations. *See Exhibit 3*, Avangrid, Inc., 2018 10-K Form at pg. 41 (Doc. 16-21).

112.    In January 2019, Douglas Herling, in his role as President and CEO of Central Maine Power, sent a letter to CMP Customers, purporting to address the PUC's findings from an independent audit conducted by the Liberty Consulting Group into the CMP SmartCare billing system ("the Liberty audit"). *See Exhibit 12,* Letter from Douglas Herling to CMP Customers (January 2019) (Doc. 17-4).

113.    Douglas Herling stated in his letter that the Liberty audit concluded that "all systems from meter to bill are working as intended and bills are accurate."

114.    This was a false statement and Douglas Herling either knew or should have reasonably known that this statement was a misrepresentation of the Liberty audit findings.

115.    In his letter, Douglas Herling further misrepresented the Liberty audit's findings when he stated that the only shortcoming identified by the audit regarded CMP's failure to dedicate enough "staff, training or management oversight" to ensure adequate customer service after the SmartCare rollout.

116.    In truth, the Liberty audit took issue with CMP's implementation of the Customer Information System, not merely with its incompetence following its implementation.

117.    An article in the Portland Press Herald dated May 3, 2018 states that Douglas Herling said in an April 5 conference call with reporters that "[w]e have done our investigation, at this point in time we have not found anything about our system or smart meters that would artificially increase customers' usage." *See Exhibit 13, CMP knew about problems with its new billing system right from the start, memos show*, PORTLAND PRESS HERALD, May 3, 2018 (Doc. 17-5).

118.     This was a false statement and Douglas Herling either knew or reasonably should have known that this statement was not true.

119.     An article in the Bangor Daily News dated May 4, 2018 states that Douglas Herling said in a conference call with reporters on April 6, 2018 that "[w]e've not found anything in the billing system or the smart meter system that would artificially increase customer usage." *See Exhibit 14, Documents show CMP knew of billing problems early on, feared investigation*, BANGOR DAILY NEWS, May 4, 2018 (Doc. 17-6).

120.     This was a false statement and Douglas Herling either knew or reasonably should have known that this statement was not true.

121.     Douglas Herling, given his stature as President and CEO of CMP, knew or should have known that his long-awaited public response to customer complaints following the Liberty audit would instill a false sense of finality in the minds of CMP customers and curtail their desire to challenge their erroneous bills.

122.     Douglas Herling intended to misrepresent the findings of the Liberty audit in a letter to customers and to make the false statement to the press—and therefore the public—that CMP was unaware of anything in the billing system or smart meter system that would artificially increase customer usage.

123.     The Plaintiffs, and others similarly situated, relied on Douglas Herling's statements to their detriment insofar as they, *inter alia*, made payments, purchased appliances, paid electricians to check their wiring, and traveled to their properties to observe CMP's meter tests.

## **REPRESENTATIVE CLASS PLAINTIFFS**

### *Mark Levesque*

124.     Shortly after CMP rolled out SmartCare, Mark Levesque and his family began to

be overcharged for their electricity.

125.     For example, the family's previous bills were roughly $300 per month, but the bills for November and December 2017 were $407 and $421 respectively.

126.     The incorrect bills continued as follows:

     a.   January 2017: $323.58     January 2018: $491.10

     b.   February 2017: $253.91   February 2018: $431.31

     c.   March 2017: $236          March 2018: $401.80

     d.   April 2017: $283.17        April 2018: $455.09

     e.   May 2017: $310.87          May 2018: $219.83

     f.   June 2017: $343.66         June 2018: Did not receive a bill

     g.   July 2017: $342.05         July 2018: Did not receive a bill

     h.   August 2017: $267.15       August 2018: Did not receive a bill

     i.   September 2017: $268       September 2018: Did not receive a bill

     j.   October 2017: $471.57      October 2018: $1587.51

127.     Mr. Levesque was concerned that his family was being overcharged because there was a sudden, drastic increase in the amount of their bill and recorded kilowatt hours after CMP rolled out SmartCare.

128.     Despite his misgivings, Mr. Levesque believed that he needed to pay the bills as presented or face disconnection, penalties, fees, and/or derogatory credit marks.

129.     When Mark Levesque contacted CMP in early 2018, prior to paying his January 2018 bill, about his recent excessively high bills he was told that the bills were accurate, that the only thing he was being charged for was for the kilowatt hours used in the home and that the increased bills were somehow his family's fault (*e.g.*, because they were purportedly using more heat, had faulty appliances, or older appliances etc.).

130.    During this phone call, the CMP sales representative told Mr. Levesque that "when customers request to have the meter test done, those all come back accurate. So we do pretty much chalk [high bills up] to the customers using the heat more often."

131.    The CMP sales representative also told Mr. Levesque during this phone call that "we don't know until we look at the customer's bill why their bills increased." This statement conveys that merely looking at a bill always confirms the reason why a bill is higher than normal and that the bill, and the metering upon which it is predicated, is accurate. Looking at a bill provides no insight as to whether the meters accurately registered kilowatt usage, which is the *sine qua non* of determining whether a bill is accurate. Instead, when CMP looks at a high bill that a customer questioned as inaccurate, and sees that indeed, the bill is higher than normal, this triggers CMP to begin presenting ideas that blame the customer as to why the bill is high with the intent that the customer will accept one or more of these ideas and rely on it as true.

132.    During this same phone conversation, Mr. Levesque said that his family uses an electric fireplace "a little bit." When Mr. Levesque asked the CMP sales representative if there is any way to bring his bill down at all, the CMP representative said "yes, stop using that electric heater" and laughed and then said "unplug that fireplace" and then laughed some more. She then asked "do you use a dehumidifier at home?" Mr. Levesque said sometimes during the summertime but not during the winter.

133.    CMP represented to Mr. Levesque that the bills were accurate and that he was being charged only for kilowatt hours used in the home, despite knowing that the bills were inaccurate due to the new SmartCare system. These representations were false.

134.    These misrepresentations were of a material fact, namely, whether CMP was justified in charging the amount stated on the bill.

135.    These misrepresentations were made by CMP with knowledge of their falsity or in reckless disregard of whether they was true or false.

136.    These misrepresentations were made for the purpose of inducing Mr. Levesque to rely on their truth and ultimately pay for electricity his household did not consume.

137.    Mr. Levesque was justified in relying upon these misrepresentations as true because CMP possesses superior knowledge as to its metering and billing systems and because the customer will face the threat of disconnection if it does not pay the erroneously high bill, regardless of its accuracy.

138.    Mr. Levesque acted in reliance upon these misrepresentations as true to his damage.

139.    Mr. Levesque's CMP bills for the months November 2017 through April 2018 were each false representations made by CMP because they charged him for kilowatt hours that his family's home did not consume, thereby demanding he pay erroneously high bills.

140.    These misrepresentations were of a material fact, namely, the amount he is required to pay.

141.    These misrepresentations were made by CMP with knowledge of their falsity or in reckless disregard of whether they were true or false.

142.    These misrepresentations were made for the purpose of inducing Mr. Levesque to rely on their truth and ultimately pay for electricity his household did not consume.

143.    Mr. Levesque was justified in relying upon these misrepresentations as true because when a customer receives a bill from a company that provides a service that he cannot live without, and (i) the company says the bill is accurate, (ii) the company is in a position of possessing superior knowledge of whether the bill is accurate, and (iii) it's the case that the customer will face a variety of severe and adverse consequences if he does not pay rely on the

truth of the false representation, the customer has no reasonable alternative other than to pay the bill.

144.    CMP represented to Mr. Levesque that the bills were accurate, despite knowing that the bills were inaccurate due to the new SmartCare system.

145.    CMP's representations to Mr. Levesque that his bills were accurate were misrepresentations.

146.    Mr. Levesque reasonably relied on CMP's representations as true to his detriment.

147.    Mr. Levesque suffered damages, including but not limited to, by paying for electricity his household did not consume, at a minimum, for the months January through April 2018.

148.    In February 2018, Mr. Levesque made a $400.00 payment towards his January 2018 bill. This $400.00 payment is about 24% more than his CMP bill in January 2017 was, and he paid this excess amount (being about 81% of his January 2018 total bill), because (i) he relied on the content of his January 2018 bill; (ii) he was told by a CMP representative that the bill was accurate; and (iii) he feared that his power would be disconnected if he did not pay a substantial portion of this high bill.

149.    In March 2018, Mr. Levesque made another $400.00 payment, this time towards his February 2018 bill. This $400.00 payment is about 58% more than his CMP bill in February 2017 was, and he paid this excess amount (being about 93% of his February 2018 total bill), because (i) he relied on the content of his February 2018 bill; (ii) he was told by a CMP representative in early 2018 that his bills were accurate; and (iii) he feared that his power would be disconnected if he did not pay a substantial portion of this high bill.

150.    Mr. Levesque's March 2018 CMP bill was about 70% higher than his March 2017 CMP bill. Mr. Levesque paid $500 to CMP in April 2018, being about 112% more than his March

2017 CMP bill. He made this $500 payment, because (i) he relied on the content of his March 2018 bill; (ii) he was told by a CMP representative in early 2018 that his bills were accurate, and (iii) he feared that his power would be disconnected if he did not pay this erroneously high March 2018 bill and some of the balance "due" from his January and February 2018 bills.

151.    In May 2018, Mr. Levesque made a $400.00 payment towards his April 2018 bill. This $400.00 payment is about 41% more than his CMP bill in April 2017 was, and he paid this excess amount (being about 88% of his April 2018 bill), because (i) he relied on the content of his April 2018 bill; (ii) he was told by a CMP representative in early 2018 that his bills were accurate and (iii) he feared that his power would be disconnected if he did not pay a substantial portion of this high bill.

152.    Despite informing CMP that he disputed his bills, and despite paying amounts to CMP in early 2018 that were substantially greater than his bills for correlating months in 2017, he received disconnection notices.

153.    Mr. Levesque was issued disconnection notices from CMP both in April 2018 and in August 2018, which was odd because Mr. Levesque had not received a CMP bill for the months of approximately May through September 2018.

154.    The disconnection notices demanded that Mr. Levesque pay the disputed charges in order to avoid disconnection.

155.    Mr. Levesque paid these bills in reliance on their content, CMP customer service representatives' statements to him, and CMP's reports of their accuracy.

*Christie Decker*

156.    Shortly after CMP rolled out SmartCare, Christie Decker and her family began to be overcharged for their electricity.

157.   The family's previous bills were roughly $32 per month on average, with a slight increase to $50 or $60 in the winter. For example, Ms. Decker's September 2017 bill was $60.88.

158.   Following the rollout of SmartCare, however, Ms. Decker's bills increased exponentially.

159.   By way of example, Ms. Decker's bills, taking out any prior balances, were as follows:

      a.   December 2017:   $195.18

      b.   January 2018:        $259.54

      c.   February 2018       $319.76

      d.   March 2018:        $375.21

      e.   April 2018:         $250.98

160.   Ms. Decker believed that her family was being overcharged because there was a sudden, drastic increase in the amount of their bill and recorded kilowatt hours after CMP rolled out SmartCare.

161.   Despite her misgivings, Ms. Decker believed that she needed to pay the bills as presented or face disconnection, penalties, fees, and/or derogatory credit marks.

162.   Compared to prior periods, the higher bills especially did not make sense because of changes with the Decker family: they used a propane stove both to cook and to heat water, and they did not use their hot tub (and had not done so in years). Thus, their bills should have been lower, not higher.

163.   Ms. Decker's CMP bills for the months December 2017 through April 2018 were each false representations made by CMP because they charged her for kilowatt hours that her home did not consume, thereby demanding she pay erroneously high bills.

164.    These misrepresentations were of a material fact, namely, the amount she is required to pay.

165.    Considering the average of Ms. Decker's CMP bills from December 2017 through April 2018 was more than 450% higher than her typical winter bill of around $60.00 prior to the rollout of the SmartCare system, these misrepresentations were made by CMP with knowledge of their falsity or in reckless disregard of whether they were true or false.

166.    These misrepresentations were made for the purpose of inducing Ms. Decker to rely on their truth and ultimately pay for electricity her household did not consume.

167.    Ms. Decker was justified in relying upon these misrepresentations as true because when a customer receives a bill from a company that provides a service she cannot live without, and (i) the company says the bill is accurate, (ii) the company is in a position of possessing superior knowledge of whether the bill is accurate, and (iii) it's the case that the customer will face a variety of severe and adverse consequences if she doesn't pay the bill, the customer has no reasonable alternative other than to pay the bill.

168.    Ms. Decker acted in reliance upon these misrepresentations as true to her detriment.

169.    Ms. Decker says she made payments in excess of what she truly owed, in reliance on CMP's misrepresentations, because CMP "had the power of God over her electrical switch."

170.    Ms. Decker paid her December 2017 bill in full, even though it was erroneously high.

171.    Ms. Decker relied on the content of her December 2017 bill in making her decision to pay it in full.

172.    Ms. Decker paid her December 2017 bill, even though it was erroneously high, because it was the amount the bill required her to pay and because she feared she would suffer

negative consequences if she did not pay her bills, namely, a negative effect on her credit and the fear of having her power be disconnected by CMP.

173.    Ms. Decker was justified in relying on the content of her December 2017 bill in making her decision to pay it because CMP claimed the bill was accurate and because she knew that failure to pay it would likely lead to negative consequences for her, such as a negative effect on her credit and/or having her power disconnected.

174.    Ms. Decker suffered harm by paying her erroneously high December 2017 bill from CMP.

175.    Ms. Decker paid $200.00 towards her January and February 2018 CMP bills sometime before February 28, 2018. She made this payment because (i) the bills she received claimed she owed even more money than the $200.00 she paid, (ii) a $200.00 payment was the most she could afford, (iii) CMP told her that the bills were accurate, and (iv) she feared that if she did not pay all she could then she would suffer negative consequences from not paying her bills, namely, a negative effect on her credit and the fear of having her power be disconnected by CMP.

176.    On February 28, 2018, in the middle of the winter, Ms. Decker received a disconnection notice that stated she needed to pay $379.30, representing her January 2018 bill and the balance of her February 2018 bill after her $200.00 payment was received, before the disconnection date of March 19, 2018.

177.    CMP sent this notice despite failing to meet certain prerequisites in order to disconnect a customer between November 15 and April 15.

178.    Ms. Decker contacted CMP about the disconnection notice, and told the CMP customer representative that the bills her family had received were wrong.

26

179.    The CMP customer service representative told Ms. Decker that the increased bills were the result of something "draining" her electricity (e.g. older appliances) or must be caused by someone stealing her electricity.

180.    Ms. Decker informed CMP that the only change in the home was the installation of a new, and likely more efficient, water pump.

181.    CMP misrepresented to Ms. Decker that the bills were accurate, despite knowing that the bills were inaccurate due to the new SmartCare system.

182.    Due to the disconnect notice and CMP's misrepresentations in the bills it sent Ms. Decker, Ms. Decker made payments toward incorrect bills.

183.    On March 20, 2018, CMP tested Ms. Decker's meter, and informed Ms. Decker that her meter was accurate.

184.    Following the CMP meter test, and despite stating that her meter was accurate, Ms. Decker's May bill reflected a drastically reduced amount of electricity consumed, despite making no changes in the home. The bill totaled $81.86 and was much closer to her historical bills.

185.    Ms. Decker's June 2018 bill was $30.63, and was in line with her previous bills.

*Michael Platt*

186.    Michael Platt is a Maine resident and has been an active electrician in New England for forty years.

187.    Following the rollout of SmartCare, Mr. Platt saw his monthly electric bills skyrocket. Mr. Platt was concerned that the bills were not an accurate reflection of his household's actual electricity usage because two of his children are adults and had left home, leaving just a family of three in the home.

188.    Mr. Platt also has energy efficient appliances, cooks with propane, and heats primarily with wood. He has two small heat pumps that are used during the heating transition season when they are most efficient, and his family uses LED lighting throughout their home.

189.    In December 2017, due to CMP's misrepresentations in the bills it sent to the Platt family, Mr. Platt's wife called CMP to pay part of the incorrect $700 bill ($400) and to request a payment plan for the remaining balance.

190.    After making this call, all correspondence with CMP ceased.

191.    Platt and his family received no bills, and were unable to access their account online for months after that payment.

192.    Mr. Platt's wife grew increasingly anxious about the bill, and tried to call CMP on multiple occasions from her work, but could not wait on hold long enough to speak to a representative.

193.    In late May—six months after paying the last bill, receiving a bill, or being able to access the online account—she finally got through to a CMP customer service representative and was told that the balance on the family's account was $3,600. She was told that she needed to make a $400 payment to avoid disconnection, which she did.

194.    When Mrs. Platt told Mr. Platt about the balance and the communication, she was physically ill.

195.    Mr. Platt spoke with a CMP lineman friend, who told him: "They are in trouble Mike, don't pay it, they can't shut you off."

196.    Mr. Platt asked his wife to stop the payment, and then called the State Police, the Governor's office, the Public Advocate's office, his local representatives and senator, the PUC, and the Better Business Bureau to report the fraudulent activity of CMP.

197.    Mr. Platt finally received a return phone call from CMP customer service representative "Darrell." Darrell stated that no payment had been made on the family's account since December, to which Mr. Platt responded that the family had not received any bills and, through no fault of their own and/or due to CMP's mismanagement, did not have access to the online account.

198.    Mr. Platt asked Darrell if CMP expected his family to write CMP blank checks in the absence of any bill.  Darrell did not provide any meaningful explanation for the lack of bills or Mr. Platt's inability to access his online CMP account.

199.    Since the conversation with "Darrell," Mr. Platt has contacted CMP many times, and has been told a number of different stories about his family's bills by CMP customer service employees.

200.    During one of the conversations with "Meaghen," Mr. Platt was told: "Mike your account shows you've used 4000kwh more in the month of February (bringing the total usage to 7000kwh) than ever before, bringing your total for the month to $1,460 dollars." Mr. Platt told Meaghen that 7000kwh is somewhere in the middle of what the average American family uses annually.[6] He asked Meaghen how that was possible. Meaghen could not provide an answer.

201.    In other conversations with other CMP customer service representatives, Mr. Platt has been given other explanations and been issued verbal threats of disconnection.

*Sylvia Krainin*

202.    Ms. Krainin's family has owned property in Naples, Maine dating back to 1958.

---

[6]  According to the U.S. Energy Information Administration (EIA), in 2018, the national average of annual consumption for a residential utility consumer was 10,972 kWh, which is approximately 914 kWh per month, https://www.eia.gov/tools/faqs/faq.php?id=97&t=3, while in Maine, in 2018, the average monthly residential customer was billed for 572 kWh of consumption. https://www.eia.gov/electricity/sales_revenue_price/pdf/table5_a.pdf.

203.    Until the winter of 2016-17, the family home had always been closed for the winter. During the winter months when the house was unoccupied, the lights and appliances were always turned off, the heat was set low, and the CMP bill was routinely $15.00 to $45.00 per month.

204.    Although the house had been unoccupied during the winter for years, beginning in September, 2016, Ms. Krainin's sister lived in the house from September, 2016 through June 2017. The house was then rented during the summer.

205.    Ms. Krainin's sister moved back into the house in September 2017 and lived there until June 2018, when it was again rented during the summer months.

206.    Ms. Krainin's sister moved back into the house in September 2018 through December 5, 2018, and then moved out of the residence, leaving it unoccupied.

207.    Even while the house was <u>occupied</u> in October 2016, the CMP bill was in the amount of $88.26.

208.    Similarly, the bills from the winter that the house was <u>occupied</u> ranged from $102.15 to $135.16 per month.

209.    After Ms. Krainin's sister moved out on December 5, 2018, no one lived in the house. Since that date, lights and appliances were turned off and not used.

210.    Sometime in January, 2019, Ms. Krainin received a letter from Douglas Herling, CEO of CMP. The letter stated that all CMP bills are accurate, and indicated that CMP had taken measures to address customer questions and problems.

211.    The February 2019 CMP bill received (for January usage dates) totaled $291.14, despite the house being <u>unoccupied</u>. This high bill for an unoccupied house was concerning to Ms. Krainin.

212.    The March 2019 bill that Ms. Krainin received (for February use) totaled $363.26, despite the house being unoccupied.

213.    Ms. Krainin believed that she was being overcharged because there were substantial inexplicable increases in the amount of her bill and alleged recorded kilowatt hours in the months following CMP's implementation of SmartCare.

214.    Despite her misgivings, and in part to due to Douglas Herling's January 2019 letter, Ms. Krainin believed that she needed to pay the bills as presented or face disconnection, penalties, fees, and/or derogatory credit marks.

215.    On March 14, 2019, at 10:30 a.m., Ms. Krainin contacted CMP and had a lengthy phone call with customer service representative "Evan" to voice her complaints and concerns of potential overbilling. Evan advised that Ms. Krainin and her family's usage was "consistent" and that the problem had to be on her and her family's end, such as the hot water heater, a well pump, a sump pump, a furnace issue, or something similar. Evan also suggested that the neighbors must be stealing their electricity, and suggested that various appliances must be broken.

216.    Ms. Krainin advised Evan that the hot water heater was not on because no one had been living in the house during that winter. She also advised him that the house did not have its own well or sump pump, and that the heat system was run on kerosene and not electricity.

217.    Evan advised Ms. Krainin that she would need to schedule a meter test and that she should sign up for "energy manager." Ms. Krainin scheduled a meter test for April 5, 2019, at 9:00 a.m. and had to fly up from Miami, Florida, to be there in person.

218.    On April 5, 2019, at 9:00 a.m., a CMP technician came to the house.

219.    Ms. Krainin had the family electrician, Ben Emmons from Brook Trout Electric, meet her at the home as well. Mr. Emmons is a master electrician and was present for the testing. While at the house, Mr. Emmons checked all circuits and found no faults whatsoever, and noted that everything was working as it should. He indicated, and confirmed in writing, that he could find no reason why the meter was reading such a high amount of usage.

220.    Ms. Krainin incurred travel and accommodation costs and other damages associated with her needing to travel to Maine to observe CMP's April 2019 meter test.

221.    The CMP technician conducted a meter test using CMP equipment and said the results were accurate per a letter Ms. Krainin had received from Customer Service. However, the CMP technician stated that she had no explanation for the high bills, and acknowledged that there simply was no way that that the home could be generating the amount of electricity on the bills, as no one was living in the house, the heat was set to 47 degrees, the hot water and appliances were turned off, and the home utilized a kerosene furnace.

222.    Once Ms. Krainin signed up for CMP's "energy manager" program, she and her brother began to pay attention to the kilowatt hour (kWh) usage and review historical data on the account.

223.    Using 2018 as an example, each month showed a material increase in the kWh usage above and beyond what the usage had been in previous years. For instance: January 2018 showed 1,136 kWh which was up 48% from the 769 in January 2017.

224.    The March 2018 report showed 1,057 kWh which was up 37% from the 769 in March 2017.

225.    April 2018 showed 1,097 kWh, which was up 49% from the 735 figure from April 2017.

226.    By way of additional examples, the data for September 2018 showed 1,782 kWh, which was a 58% increase over the 1,129 figure from September 2017.

227.    The October 2018 data showed 1,475 kWh, which was a 102% increase over the 731 kWh from October 2017.

228.    November 2018 yielded a figure of 1,943 kWh, which again was a 102% increase over the 964 from November 2017.

229.    December 2018 showed usage of 1,810 kWh, a 63% increase over December 2017.

230.    Tellingly, their review of data also showed that a major change in the recorded usage occurred at exactly the time Ms. Krainin spoke with CMP on the phone on March 14, 2019.

231.    The phone call March 14, began around 10:30 a.m. and ended sometime around midday. In that call, Ms. Krainin complained about bills showing excessive usage per month during time when no one was occupying the house and appliances were turned off. Sure enough, the supposed "usage" dropped precipitously at a time immediately following or right around the time of her call with CMP.

232.    Specifically, the data show that the average daily usage for the first 13 days of the month (March 1 through March 13, 2019) was approximately 71 kWh per day. On March 13, the day before the call with CMP, the recorded usage was 71.9 kWh. On March 14 itself, the day Ms. Krainin finished speaking with CMP around the middle of the day, the recorded usage was 43.35 kWh. On March 15, the first whole day after the call with CMP, the recorded usage was 4.75 kWh. Indeed, for the rest of the month of March (March 15 through March 31), the average daily usage was 5.34 kWh per day. The daily usage remained at a similar level through April.

233.    On April 26, 2019, Ms. Krainin received for the first time a document enclosed with her bill which was entitled "Important Information about the Maine Public Utilities Commission's Interim Payment Policy." The document defines "qualifying customers" and states "**Even if you dispute the amount of your bill, you must pay the Interim Payment Amount**." (Emphasis in original).

234.    However, when Ms. Krainin called CMP to dispute overcharges and to establish the amount of undisputed charges, she was told in no uncertain terms to <u>not pay any portion</u> of the bill by "Joe" from the Augusta call center. Joe said that CMP's "set aside team" would review the matter but he advised her **<u>not</u>** to pay the bill.

235.    The bill Ms. Krainin received on April 26, 2019, was for $34.82 plus a $2.10 late fee – an amount that closer to what was historically billed for her unoccupied house.

236.    From September, 2017 to the present, Ms. Krainin and her family have been overbilled at least $1,600.

237.    On May 13, 2019, Ms. Krainin received a call from Renee with CMP's Augusta Call Center advising that the "set aside team" had reviewed the disputed charges from the bill due April 17, 2019 (meter read date March 20, 2019) and was advised that $83.71 was eligible to be temporarily set aside and her responsibility was $119.00.

238.    During the phone call with Renee, Ms. Krainin also asked about the complaint she had lodged for the past due bills that had been paid, because she believes she was overbilled from September, 2017 to the present. Ms. Krainin was told there was nothing CMP could do.

239.    At no time has CMP given any kind of explanation for the bizarre and concerning fact pattern described above to Ms. Krainin, nor has it in any way acknowledged the disturbing billing and customer service practices.

*Sally M. Trussell*

240.    Ms. Trussell has been a Maine resident for approximately 40 years. She lived in Portland for more than 25 years before moving to Scarborough approximately 13 years ago.

241.    She currently lives in a three-story condominium in the Atlantic House community at Scarborough Beach.

242.    For the past few years, her electricity bill has averaged below or around $150 per month with slight variations. For example, the total amount of payments for the 12 months from September 1, 2017 through August 6, 2018 (12 payments) was $1,736.99, which is an average of $144.75 per month.

243.    In late summer of 2018, Ms. Trussell switched her CMP account over to the CMP automatic payment feature in lieu of receiving and paying paper bills.

244.    In early September 2018, the automatic payment made to CMP was $193.83, which was nearly 25% higher than the corresponding bill from early September, 2017.

245.    In early October, 2018, the automatic payment made to CMP was $267.95, which was more than 40% higher than the corresponding bill from early October, 2017.

246.    Although for decades Ms. Trussell and her husband had never been away from their residence in Maine for more than a week or two at a time, on November 10, 2018, they started living in Westminster, South Carolina.

247.    From that date to present, no one has been living in the Scarborough house. The lights have been kept off and appliances are not being used. The heating system was set to keep the temperature around 50 degrees.

248.    During the time Ms. Trussell and her husband have been away, the condominium association has sent a representative into the unit approximately once per month to make sure, among other things, appliances and machines are not running and power is not being unnecessarily used.

249.    In early January 2019, Ms. Trussell noticed that her December 17, 2018 CMP bill was $640.02. This was significantly higher than any CMP bill she had ever received.

250.    The full amount of the bill had been paid automatically from Ms. Trussell's bank account on January 7, 2019.

251.    In January 2019, Ms. Trussell received a letter from Douglas Herling, CEO of CMP, stating that all CMP bills are accurate, and that additional employees had been hired and trained to address customer questions.

252.    Ms. Trussell discovered on January 25, 2019, that her next bill (dated January 22, 2019) was for $1,484.98. Once again, this was drastically higher than any charge she had ever received.

253.    After discovering the alarming billed amount, on February 1, 2019, she called CMP to cancel the AutoPay feature on her account. A CMP representative assured her that the AutoPay was deactivated for the account, and gave her the confirmation code of #1901232207738.

254.    On or about February 1, 2019, Ms. Trussell asked her neighbor to go into her unit to make sure that minimal power was being used.  She informed Ms. Trussell that, indeed, the lights were off, appliances were not being used in the house, and the temperature remained set at 50 degrees.

255.    Ms. Trussell believed that she was being overcharged because there was a sudden, drastic increase in the amount of their bill and recorded kilowatt hours after CMP rolled out SmartCare.

256.    Despite her misgivings, Ms. Trussell believed that she needed to pay the bills as presented or face disconnection, penalties, fees, and/or derogatory credit marks.

257.    Ms. Trussell made several attempts to talk to customer service representatives at CMP to find out what was going on and obtain an explanation for the drastic changes in her billing and alleged usage, but she could not get any answers or useful information from any of them.

258.    At no time has Ms. Trussell ever received any sort of explanation from CMP for the excessive charges, nor has CMP in any way admitted a mistake or blame of any kind.

259.    The February 2019 bill issued by CMP was for $562.20, which again was significantly higher than any bill she had ever received before the events described.

260.    The February bill stated that the total Ms. Trussell owed was $2,047.18, which equals the January and February amounts billed by CMP, namely $1,484.98 (January) and $560.20 (February).

261.    Despite having been assured by CMP that the automatic payments had been cancelled on February 1, 2019, a payment of $2,047.18 appeared on Ms. Trussell's statement for her checking account at Norway Savings Bank on March 12, 2019 with the description: "CMP CMP PMT 24166716022519."

262.    The money was taken from Ms. Trussell's account by CMP without her knowledge or authorization and expressly against her consent. At no time did she ever authorize any such payment to CMP, nor did she have any reason to expect any such payment to occur given her cancellation of AutoPay and her ongoing concerns about inflated bills.

263.    On the March 2019 paper bill Ms. Trussell received, the billed amount was $42.27. This was in line with her expectations of electricity usage for her house that was not being lived in at the time.

264.    Her March 2019 bill also indicated that a "payment" had been received in the amount of $2,047.18, without explanation, description, or any other information.

265.    In short, after cancelling the AutoPay feature on her account and receiving a confirmation number for the same, CMP took $2,047.18 from her bank account without her authorization or consent and, in fact, in contravention of the same.

266.    That $2,047.18 has not been restored to her bank account, nor has CMP provided any explanation for the grossly inflated figure.

267.    Ms. Trussell called CMP to complain about the payment on her bill and get an explanation. CMP told something to the effect of: "You paid that amount and it has been credited to your account."  Ms. Trussell could not get any other information or explanations from CMP about

this payment or about any mistakes made on their part in the meter reading, billing, invoicing, failed cancellation of AutoPay, or anything else.

268.   Again, tellingly, after contacting CMP in March to report concerns about her bill, her purported metered usage fell from 2,786 kWh for parts of November and December 2018, and 2,448 kWh for parts of January and February 2019, to 219 kWh on her March 2019 bill (reflecting usage from February/March 2019), a more than 10-fold reduction in metered usage from prior months' bills of the same winter season that is more in line with her typical winter bills.

269.   At no time has Ms. Trussell been able to get any kind of clarification or reason from CMP for the erratic and erroneous charges, billing practices, and AutoPay cancellation failures, nor has CMP refunded or credited her account any monies from the manifest errors in her account's metering and billing.

## CLASS ACTION ALLEGATIONS

270.   The Named Plaintiffs commence this class action pursuant to Maine Rule of Civil Procedure 23, including Rule 23(b)(3), on behalf of the following Class: All CMP customers who were overbilled and/or overcharged as a result of the defective SmartCare system after October 30, 2017 and who incurred damages as a result.

271.   Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment. Excluded from the Class are any judicial officers presiding over this matter and the members of their immediate families and judicial staff, as well as Class counsel.

272.   Numerosity: The proposed Class is so numerous that joinder of all members is impracticable, and the disposition of their claims as a Class will benefit the parties and the Court. The precise number of such persons is unknown because the data required to calculate that number

is presently within the sole possession, custody, and control of the corporate defendants. Upon information and belief, there are approximately 297,000 CMP customers who are members of the Class.

273.   Commonality and Predominance: There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class members, including, but not limited to, the following:

a.   Whether the CMP and/or the corporate defendants, knowing that the SmartCare system was defective, overcharged Class Members for the amounts of power delivered;

b.   Whether the defendants, faced with complaints about defects in the SmartCare system, fraudulently and intentionally misrepresented the alleged accuracy of the increased bills in an effort to suppress such complaints and cause customers to pay the inaccurate bills;

c.   Whether the corporate defendants made fraudulent and intentional misrepresentations to customers that the high bills were the fault of the customer when knowing that they were the fault of the SmartCare system in an effort to cause customers to pay the inaccurate bills;

d.   Whether CMP breached its contract with its customers in failing to provide accurate metering and billing of the electricity delivered to and consumed by its customers;

e.   Whether it is inequitable for the corporate defendants to retain the money that they received as a result of overcharging customers;

      f.  Whether the corporate defendants violated 18 U.S.C. § 1962(c) by conducting or participating in the conduct of the affairs of the Iberdrola-Avangrid-CMP association-in-fact enterprise through a pattern of racketeering activity.

      g.  The proper measure of damages recoverable by Class members; and

      h.  Additional common questions of law and fact as developed during the discovery phase of this litigation.

274.   Typicality: The Named Plaintiffs' claims are typical of the claims of the Class, as such claims could be alleged by any member of the Class, and the relief the Named Plaintiffs seek is typical of the relief that Class members seek. All the Class members were subject to the same alleged practices of the corporate defendants and the intentional misrepresentations of all defendants. Specifically, the corporate defendants' policies and practices affected all Class members similarly, and they benefited from the same type of unfair and wrongful acts as to each Class member. Likewise, the intentional misrepresentations made by all defendants, including Douglas Herling, affected all Class members similarly, and the defendants benefited from the same type of unfair and wrongful acts as to each Class member as a result of the misrepresentations. The Named Plaintiffs and other Class members sustained similar losses, injuries, and damages arising from the same unlawful policies, practices, and procedures of the corporate defendants and misrepresentations made by all defendants.

275.   Adequacy: The Named Plaintiffs can fairly and adequately protect the interests of the Class and have no interests adverse to the Class. At all relevant times, the Named Plaintiffs and Class members are and have been similarly situated. The Class representatives and their chosen attorneys are familiar with the subject matter of the lawsuit, have full knowledge of the allegations contained in this amended complaint, and can prosecute this matter. In addition, the representatives' attorneys are competent in the relevant areas of the law and have sufficient

experience to vigorously represent the Class. Furthermore, the resources available to Class counsel ensure that the litigation will not be hampered by a lack of financial capacity. The Named Plaintiffs' attorneys have sufficient financial resources and are willing to absorb the costs of the litigation.

276.    Superiority: Prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class. The losses, injuries, and damages are relatively small, such that without class treatment, individual action by each Class member would be cost-prohibitive. Accordingly, the Class members do not have any interest in individually controlling the prosecution or defense of separate actions.

277.    Moreover, there has not been any other litigation concerning this controversy. Concentrating the litigation in this forum is desirable because it is where one of the Class representatives and a substantial number of Class members reside. No difficulties should be encountered in managing this case as a class action. Indeed, the claims are straightforward, and all Class members have the exact same problem. In other words, this case was tailor-made to be brought as a class action.

278.    Ascertainability. The Class members are readily ascertainable. For notice and other purposes related to this action, the number and identity of the Class members are determinable from the corporate defendants' business records.

279.    As a shorthand and for clarity, those persons who make up the proposed Class (all CMP customers who were overbilled and/or overcharged after October 30, 2017, and who incurred damages as a result) are hereinafter referred to as "the Class members."

## CAUSES OF ACTION

### COUNT I

41

**UNJUST ENRICHMENT**

280.    The Named Plaintiffs and the Class members repeat, reallege, and incorporate by reference the above paragraphs as if fully set forth herein.

281.    The Named Plaintiffs and the Class members were improperly, unlawfully, and unjustly overcharged by the SmartCare system, and they conferred a benefit on the corporate defendants when they paid the inappropriate bills.

282.    The defendants were aware that customers were being improperly overcharged: CMP received thousands of customer complaints and the defendants knew about the persistent problems with the SmartCare system.

283.    As a direct and proximate result of the corporate defendants' overcharging of the Named Plaintiffs and Class members, the Named Plaintiffs and Class members have suffered damages in an amount to be proven at trial.

284.    The corporate defendants have ignored customer complaints and have not returned the excess payments.

285.    It would be inequitable for the corporate defendants to retain the amount of these overcharges because this money belongs to the Named Plaintiffs and Class members.

WHEREFORE, the Named Plaintiffs and the Class members respectfully request that this Court award damages, including those from emotional distress, and such other relief as this Court deems just and equitable.


**COUNT II**
**BREACH OF CONTRACT**

286.    The Named Plaintiffs and the Class members repeat, reallege, and incorporate by reference the above paragraphs as if fully set forth herein.

287.    CMP enters into a contractual relationship with its customers when it renders services to customers.

288.    The contractual relationship between CMP and its customers required CMP to accurately measure each customer's electrical usage and to accurately bill the customer for transmission and delivery services based on such usage.

289.    CMP knowingly charged, demanded, collected and/or received from the Named Plaintiffs and/or the Class members amounts greater than what the Named Plaintiffs and/or the Class members owed.

290.    The aforesaid actions by CMP in overcharging the Named Plaintiffs and/or the Class members constitutes a breach of a material term of the contract.

291.    As a result of CMP's breach of contract, the Named Plaintiffs and/or the Class members suffered and continue to suffer damages.

WHEREFORE, the Named Plaintiffs and the Class members respectfully request that this Court award damages, including those from emotional distress, and such other relief as this Court deems just and equitable.

**COUNT III**
**PRIVATE CAUSE OF ACTION**
**35-A M.R.S. Section 1501: Liability for Civil Damages**

292.    The Named Plaintiffs and the Class members repeat, reallege, and incorporate by reference the above paragraphs as if fully set forth herein.

293.    Title 35-A, Section 1501 of Maine law provides that if a public utility violates the laws and regulations concerning the provision of electrical services to the Named Plaintiffs and the Class members or omits to do anything that State laws and regulations requires it to do, that utility can be held liable in damages to the person injured as a result, and that recovery under State law does not affect a recovery by the State of the penalty prescribed for said violation(s).

294.    Based on the foregoing, and as a result of their fraudulent and intentional conduct, the corporate defendants caused or permitted violations of State laws and regulations concerning the provision of electrical services to the Named Plaintiffs and the Class members.

295.    Based on the foregoing, and as a result of their fraudulent and intentional conduct, the corporate defendants failed to comply with State laws and regulations concerning or arising out the provision of electrical services to the Named Plaintiffs and the Class members.

296.    As a direct result of the corporate defendants' acts and omissions, the Named Plaintiffs and Class members suffered injuries and damages.

297.    The Named Plaintiffs and the Class members have been injured by CMP's wrongful billing practices, overcharges, and excessive charges. They have paid incorrect amounts as a result of the SmartCare system.

298.    State law creates a stand-alone cause of action for the Named Plaintiffs and the Class members injured as a direct result of CMP's failure to comply with State laws and regulations governing the provision and billing of electrical services.

WHEREFORE, the Named Plaintiffs and the Class members respectfully request that this Court award damages, including those from emotional distress, and such other relief as this Court deems just and equitable.

## COUNT IV
## FRAUD AND INTENTIONAL MISREPRESENTATION:
## CORPORATE DEFENDANTS

299.    The Named Plaintiffs and the Class members repeat, reallege, and incorporate by reference the above paragraphs as if fully set forth herein.

300.    The corporate defendants knowingly and intentionally acted to defraud customers and made use of acts of artifice or deceit that were intended to deprive owners (electricity customers) of their money.

301.    Following the rollout of SmartCare in October 2017, the Named Plaintiffs and many class members were overbilled for their electricity usage. The corporate defendants caused to be sent to CMP customers electricity bills that falsely and fraudulently misrepresented the amount of money owed by the customer.

302.    The corporate defendants were aware of such inaccurate billings, but nonetheless caused them to be sent, and, through public statements to the media, in personal conversations with and written correspondence with customers who questioned CMP regarding their high bills, affirmatively misrepresented to customers that the inaccurate bills were accurate.

303.    The corporate defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions they made to customers were material.

304.    The corporate defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions they made to customers were false.

305.    The corporate defendants wrongfully withdrew funds from customers' bank accounts predicated on false and fraudulent electricity bills.

306.    The corporate defendants falsely and fraudulently misrepresented to customers that their electricity would be disconnected if they failed to pay their false and fraudulent electricity bills.

307.    These threats of disconnection were also in violation of state law, regulations, and PUC order.

308.    The corporate defendants trained their customer service staff to convey form statements to customers regarding the accuracy of questioned electricity bills, while knowing that the bills and the form statements were false and fraudulent.

309.    On April 5, 2018, the corporate defendants, through Douglas Herling, caused statements to be made to the public via the media which falsely and fraudulently misrepresented

CMP's knowledge of the problems with SmartCare, with the intent to induce customers to believe that the false and fraudulent electricity bills were accurate.

310.     On April 6, 2018, the corporate defendants, through Douglas Herling, caused statements to be made to the public via the media falsely and fraudulently misrepresenting CMP's knowledge of the problems with SmartCare, with the intent to induce customers to believe that the false and fraudulent electricity bills were accurate.

311.     In January 2019, the corporate defendants, through Douglas Herling, caused a letter to be sent to CMP customers that falsely and fraudulently misrepresented the conclusions of the Liberty audit, with the intent to induce customers to believe that the false and fraudulent electricity bills were accurate.

312.     The Named Plaintiffs, the class members, and their banking institutions detrimentally relied upon the corporate defendants' misrepresentations and were deceived by the same.

313.     The Named Plaintiffs and the Class members did not know that the statements and representations were false and fraudulent. On information and belief, those banking institutions that permitted automated withdrawals by "CMP" likewise did not know that the statements and representations were false and fraudulent.

314.     The Named Plaintiffs' and the Class members' damages were directly caused by these instances of fraud and intentional misrepresentation. But for the fraud and misrepresentations, the Named Plaintiffs and the Class members would not have been damaged.

315.     The Named Plaintiffs' and the Class members' damages were foreseeable to the corporate defendants because the corporate defendants' misconduct, including sending customers disconnection notices without the true intent to disconnect their power if they did not comply, was designed with the intent to cause those very injuries.

316.    There are no intervening causes to the Named Plaintiffs' and the Class members' damages.

317.    Directly due to the corporate defendants' misrepresentations about the veracity of the electricity bills, the Named Plaintiffs and the Class members paid money to CMP not owed, or their banking institutions allowed their accounts to be debited by CMP for bills that were not owed.

318.    Directly due to the corporate defendants' misrepresentations about the veracity of the electricity bills, Named Plaintiffs and Class members expended money trying to fix problems that did not exist (for example, but without limitation, hiring electricians, and replacing appliances).

319.    Because of the threat of disconnection, CMP knowingly forced many customers to pay the monthly bills even though they were overcharged.

320.    CMP intentionally misrepresented to customers and the public that the new billing system and/or faulty meters were not the cause of the outrageously high bills for the purpose of having customers like the Named Plaintiffs and/or Class members pay excessive bills.

321.    CMP customer service personnel were trained to tell customers that any charges or abnormalities in the bills were the customers' fault and not CMP's. Said policy in effect in 2017 and 2018 was to conceal the overcharging caused by the SmartCare system.

322.    CMP intentionally misrepresented to customers like the Named Plaintiffs and/or Class members that there was nothing wrong with CMP bills and made said representations to collect the outrageously high bills.

323.    CMP intentionally misrepresented to customers like the Named Plaintiffs and/or Class members that the customers were to blame for the outrageously high bills.

324.    CMP intentionally misrepresented to customers like the Named Plaintiffs and/or Class members that if they did not pay the outrageously high bills, their electrical services would be disconnected.

325.    CMP intentionally made the aforesaid misrepresentations or made them with reckless disregard as to whether they were true or false.

326.    The corporate defendants supplied false information and failed to exercise reasonable care and competence in communicating the aforesaid misrepresentations to the Named Plaintiffs and the Class members, and the Named Plaintiffs and/or the Class members justifiably relied on this information to their detriment, causing the Named Plaintiffs and/or the Class Members damages.

327.    The Plaintiffs and those similarly situated suffered severe emotional distress as a result of the corporate defendant's fraud and misrepresentations.

328.    The corporate defendants' actions against the Named Plaintiffs and the Class members were done with malice, or were so outrageous that malice can be implied, and as a result, the Named Plaintiffs and the Class members are entitled to punitive damages.

329.    The Named Plaintiffs and the Class members seek punitive damages.

WHEREFORE, the Named Plaintiffs and the Class members respectfully request that this Court award damages, including those from emotional distress, punitive damages, and such other relief as this Court deems just and equitable.

## COUNT V
## FRAUD AND INTENTIONAL MISREPRESENTATION:
## DOUGLAS HERLING

330.    The Named Plaintiffs and the Class members repeat, reallege, and incorporate by reference the above paragraphs as if more fully set forth herein.

331.    Douglas Herling, in his role as President and CEO of CMP and executive director of Avangrid, sent a letter to CMP customers in January 2019 stating that the Liberty audit "concluded that all systems from meter to bill are working as intended and bills are accurate." *See Exhibit 12,* Letter from Douglas Herling to CMP Customers (January 2019) (Doc. 17-4).

332.    This was a false representation of the findings of the Liberty audit.

333.    This misrepresentation of the findings of the Liberty audit pertained to a material fact, namely, whether the meters accurately calculated electricity usage and whether customers' bills were accurate following CMP's implementation of the SmartCare system.

334.    Douglas Herling made this misrepresentation with knowledge of its falsity or in reckless disregard of whether it was true or false because he either read or should have read the full Liberty audit and knew or should have known that his blanket assertion that the bills are accurate is a misrepresentation of the audit's findings.

335.    Douglas Herling made this misrepresentation in the letter he sent to all CMP customers for the purpose of inducing customers to refrain from questioning the accuracy of their outrageously high bills in reliance on his misrepresentation.

336.    Douglas Herling also made this misrepresentation for the purpose of inducing all customers to continue to pay their inaccurate, excessively high bills in reliance on his misrepresentation.

337.    Douglas Herling made this misrepresentation in a letter he sent to all CMP customers (or made available to all CMP customers), and he did so knowing that CMP customers would afford more weight to a statement made by CMP's President and CEO than they would to a similar statement made by an individual with less managerial responsibility than the company's President and CEO.

338.    CMP customers were justified in relying on the misrepresentation made by Douglas Herling in this letter he sent to all CMP customers because he misrepresented the findings of the Liberty audit, which he called "independent" and an "extensive audit," and because of his position as President and CEO of CMP.

339.    Numerous CMP customers, including the Named Plaintiffs and Class members, justifiably relied on the misrepresentation made by Douglas Herling in this letter as true and have paid inaccurate bills to their direct and proximate financial injury.

340.    The January 2019 letter that Douglas Herling sent to all CMP customers also misrepresented the findings of the Liberty audit by implying that the Liberty audit concluded that CMP's only shortcoming was "following" the implementation of SmartCare, when CMP failed to dedicate enough "staff, training or management oversight" to ensure adequate customer service.

341.    The implication that this was the only shortcoming identified by the Liberty audit was a false representation.

342.    This representation of the findings of the Liberty audit pertained to a material fact, namely, the scope of CMP's incompetence and shortcomings relating to the implementation of the SmartCare billing system, which far exceeded CMP's customer service issues following SmartCare's implementation.

343.    Douglas Herling made this misrepresentation with knowledge of its falsity or in reckless disregard of whether it is true or false because he either read or should have read the full Liberty report and he either knew or should have known that the Liberty audit found that CMP also displayed numerous shortcomings prior to the go-live date of on or about October 30, 2017.

344.    Douglas Herling made this misrepresentation to all CMP customers for the purpose of inducing customers to trust in CMP's competence in the face of customer complaints about excessively high bills, negative media attention, PUC investigations, and this lawsuit.

345.    Douglas Herling also made this misrepresentation for the purpose of inducing all customers to trust that their bills were accurate and to induce them to continue to pay their incorrect bills in reliance on his misrepresentation.

346.    CMP customers were justified in relying on the misrepresentation made by Douglas Herling in the letter he sent to all CMP customers because he misrepresented the Liberty audit's findings while calling it "independent" and an "extensive audit," and because of Douglas Herling's position as President and CEO of CMP.

347.    Numerous CMP customers, including the Named Plaintiffs and Class members, justifiably relied on the misrepresentation made by Douglas Herling in this letter and have paid excessively high bills to their detriment.

348.    An article in the Portland Press Herald dated May 3, 2018 states that Douglas Herling said in an April 5 conference call with reporters that "[w]e have done our investigation, at this point in time we have not found anything about our system or smart meters that would artificially increase customers' usage." *See Exhibit 13, CMP knew about problems with its new billing system right from the start, memos show*, PORTLAND PRESS HERALD, May 3, 2018 (Doc. 17-5).

349.    This was a false representation of CMP's and/or Douglas Herling's knowledge about whether the SmartCare system artificially increased customers' usage.

350.    Further, the representation that the SmartCare system did not artificially increase customers' usage was false.

351.    This false representation pertains to a material fact because whether the SmartCare system produced accurate bills, and whether the defendants knew that the systems did not and covered it up, relates to the heart of this lawsuit.

352.    Douglas Herling made this misrepresentation with knowledge of its falsity or in reckless disregard of whether it was true or false.

353.    An article in the Bangor Daily News dated May 4, 2018 states that Douglas Herling said in a conference call with reporters on April 6, 2018 that "[w]e've not found anything in the billing system or the smart meter system that would artificially increase customer usage." *See Exhibit 14*, *Documents show CMP knew of billing problems early on, feared investigation*, BANGOR DAILY NEWS, May 4, 2018 (Doc. 17-6).

354.    This was a false representation of CMP's and/or Douglas Herling's knowledge about whether CMP's smart meters artificially increased customers' usage.

355.    This false misrepresentation pertains to a material fact because whether the SmartCare system produced accurate bills, and whether the defendants knew that the systems did not and covered it up, relates to the heart of this lawsuit.

356.    Douglas Herling made this misrepresentation with knowledge of its falsity or in reckless disregard of whether it is true or false.

357.    Douglas Herling knew that the statements he provided to news reporters would be heard and/or seen by the public, including CMP customers who eagerly await answers as to why their bills are outrageously high.

358.    Douglas Herling made these false representations to reporters for the purpose of inducing CMP customers to refrain from questioning the accuracy of their outrageously high bills in reliance on the misrepresentation.

359.    CMP customers were justified in relying on the misrepresentation made by Douglas Herling in these statements to reporters because of his position as President and CEO of CMP.

360.    Numerous CMP customers, including the Named Plaintiffs and Class members, justifiably relied on the representation made by Douglas Herling to reporters regarding CMP's

meters' capability of producing accurate bills as true and have paid excessively high bills to their damage.

361.    The Plaintiffs and those similarly situated suffered severe emotional distress as a result of Douglas Herling's fraud and misrepresentations.

362.    Douglas Herling's actions against the Named Plaintiffs and the Class members were done with malice, or are so outrageous that malice can be implied, and as a result, the Named Plaintiffs and the Class members are entitled to punitive damages.

363.    The Named Plaintiffs and the Class members seek punitive damages.

WHEREFORE, the Named Plaintiffs and the Class members respectfully request that this Court award damages, including those from emotional distress, including punitive damages, and such other relief as this Court deems just and equitable.

## COUNT VI
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")

364.    The Named Plaintiffs and the Class members repeat, reallege, and incorporate by reference the above paragraphs as if more fully set forth herein.

365.    RICO creates a civil cause of action for those injured by certain conduct.

366.    RICO prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce" from "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

367.    As an entity capable of holding a legal or beneficial interest in property, CMP is a "person" as defined by RICO. 18 U.S.C. § 1961(3).

368.    As an entity capable of holding a legal or beneficial interest in property, Avangrid is a "person" as defined by 18 U.S.C. § 1961(3).

369.    As an individual capable of holding a legal or beneficial interest in property, Herling is a "person" as defined by 18 U.S.C. § 1961(3).

370.    Iberdrola, either itself or in combination with its employees, officers, managers, directors, agents, and affiliated entities in the Kingdom of Spain, comprises an enterprise as defined by 18 U.S.C. § 1961(4) ("the Iberdrola enterprise").

371.    The Iberdrola enterprise has continuing business purposes as described herein including all preceding paragraphs, and including but not limited to generating revenue and profits in the business of the transmission and delivery of electrical services, and the management and operation of companies providing such services.

372.    CMP, Avangrid, and Herling are "persons" distinct from Iberdrola, but are each associated with the Iberdrola enterprise and maintain relationships with the enterprise.

373.    The Iberdrola enterprise has enjoyed a longevity sufficient to permit its associates to pursue the enterprise's purpose.

374.    The Iberdrola enterprise is engaged in and affects interstate commerce by, *inter alia*, its associated "persons' " (CMP's, Avangrid's, and Herling's) use of interstate calls, wires, and mailings in furtherance of its affairs, including through the distribution of electrical power in interstate commerce and the delivery and customer service activities associated therewith.

375.    Iberdrola maintains an ongoing role in operating or managing the affairs of the Iberdrola enterprise.  However, Iberdrola is a wholly distinct entity from each of the "persons" identified above which are associated with the Iberdrola enterprise and which are involved in the conduct of its affairs.

376.    For example, while Iberdrola maintains a shareholder relationship with Avangrid, Avangrid is not a wholly owned subsidiary of Iberdrola, and is a publicly traded energy services company which serves more than three million customers in New York and New England.

54

377.    Each "person" identified above has conducted and participated in the conduct of the Iberdrola enterprise's affairs through a pattern of racketeering activity in violation of RICO, and for the unlawful purpose of intentionally defrauding the Named Plaintiffs and Class members. *See* 18 U.S.C. § 1961(1), (5) (definitions of "racketeering activity" and "pattern of racketeering activity"); 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud).

378.    Through a fraudulent scheme, the defendants have intended to overbill and have overbilled customers for their electricity usage.

379.    This fraudulent scheme was based upon the defendants' knowing and intentional acts to defraud customers, and the defendants made use of acts of artifice or deceit that were intended to deprive electricity customers of their money.

380.    The defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions they made were material.

381.    The "persons" intentionally and knowingly used the U.S. Mails, interstate telephone calls (including call centers in Maine, Texas, and Pennsylvania), and other interstate wires pursuant to and in furtherance of this fraudulent scheme.

382.    For the purpose of executing and/or attempting to execute the scheme to defraud or obtain money by means of false or fraudulent pretenses, representations, or promises, the defendants, in violation of 18 U.S.C. § 1341, caused electricity bills and other matter and things to be delivered by the U.S. Postal Service or by private or commercial interstate carrier, and/or received payments and other matter and things from the Postal Service or private or commercial interstate carriers. These acts were done intentionally or knowingly with the specific intent to advance the scheme, or with knowledge that the use of the mails would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.

383.    For the purpose of executing and/or attempting to execute the scheme to defraud or obtain money by means of false or fraudulent pretenses, representations, or promises, the "persons", in violation of 18 U.S.C. § 1343, transmitted, caused to be transmitted, and/or received by means of wire communication in interstate and foreign commerce, various writings, signs, and signals. These acts were done intentionally or knowingly with the specific intent to advance the scheme, or with knowledge that the use of wire communications would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.

384.    The matter and things sent by the "persons" via the U.S. Postal Service, private or commercial carrier, or wire, include, *inter alia*:

a.  electricity bills that falsely and fraudulently misrepresented the amount of money owed by the customer for their electricity usage in the period following the rollout of SmartCare, including, for example, those bills issued to Named Plaintiffs set forth above and incorporated herein by reference;

b.  automated banking withdrawals predicated on those false and fraudulent electricity bills, including, for example, that withdrawal made against Plaintiff Trussell described above and incorporated herein by reference;

c.  false and fraudulent misrepresentations that customers would be disconnected for failure to pay the false and fraudulent bills, including, for example, those to Plaintiffs Levesque, Decker, and Platt described above and incorporated herein by reference;

d.  a January 2019 letter from Douglas Herling falsely and fraudulently misrepresenting the conclusions of the Liberty audit and intending to induce customers to believe that their false and fraudulent electricity bills were accurate;

e.  scripted and/or form statements to customers regarding the accuracy of the false and fraudulent electricity bills;

f.   scripted and/or form statements to customers alleging that the false and fraudulent bills were accurate but increased due to other occurrences or circumstances (including but not limited to weather, faulty appliances, old wiring, children playing video games, stolen electricity, etc.); and

g.   information or communications in furtherance of or necessary to effectuate the scheme.

385.   The electricity bills issued to the Named Plaintiffs and the Class members are standardized form documents that are materially uniform.

386.   The actions described above are comprised of conduct carried out by the "persons" associated with the Iberdrola enterprise and related to its affairs.  Although they were associated with and were to the benefit of the Iberdrola enterprise, the actions described above were physically carried out or conducted in the State of Maine by the "persons" associated with the Iberdrola enterprise.

387.   The racketeering activities of the defendants against the Named Plaintiffs and the Class members share common methods of fraudulent and misleading conduct, including but not limited to those described above.

388.   The Named Plaintiffs, the Class members, and their banking institutions detrimentally relied upon the defendants' misrepresentations and were deceived by the fraudulent scheme.

389.   The Named Plaintiffs and the Class members did not know that the fraudulent scheme was occurring. On information and belief, those banking institutions that permitted automated withdrawals by CMP likewise did not know that the fraudulent scheme was occurring.

390.   The defendants committed these acts willfully or with actual knowledge of the illegal activities.

391.    The above described predicate acts are related by their common or similar purpose of defrauding customers, their common or similar results in defrauding customers, their common or similar participants, and their common victims (CMP customers).

392.    Further, the defendants' predicate acts that constitute mail fraud are related by having the same method of commission.

393.    Likewise, the defendants' predicate acts that constitute wire fraud are related by having the same method of commission.

394.    Upon information and belief, the defendants' misconduct in violation of RICO began, at the latest, in October 2017, and has been continuous until and including the present day.

395.    On information and belief, CMP customers continue to be told by CMP representatives that their bills are not correct and that their high electricity bills are due to the customers' usage or fault. On information and belief, the CMP representatives who have made and continue to make these statements were and are doing so at the direction of the defendants.

396.    There is a substantial threat of continuity due to the duration of the present misconduct; the continued denial of any wrongdoing by the defendants; as well as the existence of a similar scheme that took place in Scotland.

397.    These acts described constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

398.    The "persons" each have directly and indirectly conducted, participated in, and facilitated the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c), in furtherance of the Iberdrola enterprise's affairs and by way of different roles and conduct than Iberdrola.

399.    The Named Plaintiffs and the Class members have been directly injured by the corporate defendants' violations of RICO. But for the defendants' conduct, the Named Plaintiffs and Class members would not have been injured.

400.    The Named Plaintiffs' and the Class members' injuries were foreseeable to the defendants because the defendants' misconduct was designed with the intent to cause those very injuries, or their injuries were a natural, probable, direct consequence of the misconduct.

401.    There are no intervening causes to the Named Plaintiffs' and the Class members' injuries.

402.    Directly due to the defendant "persons' " misrepresentations in the electricity bills and about the veracity of those bills, the Named Plaintiffs and the Class members paid money to CMP not owed, or their banking institutions allowed their accounts to be debited by CMP for bills that were not owed.

403.    Directly due to the defendant "persons' " misrepresentations in the electricity bills and about the veracity of those bills, Class members are allegedly indebted to CMP with money not owed.

404.    Directly due to the defendant "persons' " misrepresentations to customers that the customers are in control of the usage shown on their false and fraudulent bills, Named Plaintiffs and the Class members have suffered consequential damages (for example, but without limitation, by hiring electricians, replacing appliances, and traveling).

405.    Directly due to the defendant "persons' " misrepresentations in the electricity bills and about the veracity of those bills, and directly due to the defendant "persons' " misrepresentations to customers that the customers are in control of the usage shown on their false and fraudulent bills, Named Plaintiffs and Class members have suffered and continue to suffer emotional distress.

WHEREFORE, the Named Plaintiffs and the Class members respectfully request that this Court award damages, including actual damages, including those from emotional distress, treble damages, attorney fees, and such other relief as this Court deems just and equitable.

## **REQUEST FOR RELIEF**

WHEREFORE, the Named Plaintiffs, individually and on behalf of the proposed Class, request relief against the Defendants as follows:

a.   an order certifying the Class, appointing the Named Plaintiffs as Class representatives, and appointing their attorneys as Class counsel;

b.   an award of damages, in an amount to be determined at trial;

c.   an award of treble damages, in an amount to be determined by trial;

d.   an award of punitive damages in an amount to be determined at trial;

e.   reasonable attorneys' fees and costs of this action;

f.   pre-judgment and post-judgment interest as provided by law; and

g.   such other and further relief that the Court may deem just and proper.

## **JURY DEMAND**

The Named Plaintiffs, on behalf of themselves and the proposed Class members, demand a trial by jury on all claims so triable.

Dated in Portland, Maine this 31st day of January, 2020.

Respectfully submitted,

 _/s/ Jeffrey D. Russell_____
Philip M. Coffin III, Bar No. 2462
Abigail C. Varga, Bar No. 4511
Jeffrey D. Russell, Bar No. 4506
Cyrus E. Cheslak, Bar No. 6171
LAMBERT COFFIN
One Canal Plaza, Suite 400
PO Box 15215
Portland, Maine 04101

pcoffin@lambertcoffin.com
avarga@lambertcoffin.com
jrussell@lambertcoffin.com
ccheslak@lambertcoffin.com


James E. Belleau, Bar No. 8314
Alex S. Parker, Bar No. 6167
Trafton, Matzen, Belleau & Frenette, LLP
10 Minot Avenue
Auburn, Maine 04212-0470
207-784-4531
JBelleau@TMBF-law.com
AParker@TMBF-law.com


Sumner H. Lipman, Bar No. 300
Law Offices of Sumner Lipman, LLC
PO Box 836
Scarborough, Maine 04070
207-806-5006
SumnerLipman@gmail.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2020, I caused a copy of the foregoing to be served by way of the ECF system, which will send notice of such filing to all counsel of record.

DATED at Portland, Maine this 31st day of January, 2020.

*/s/ Jeffrey D. Russell*
Philip M. Coffin III
Abigail C. Varga
Jeffrey D. Russell
Cyrus Cheslak
Lambert Coffin
One Canal Plaza, Suite 400
PO Box 15215
Portland, Maine 04101
pcoffin@lambertcoffin.com
avarga@lambertcoffin.com
jrussell@lambertcoffin.com
ccheslak@lambertcoffin.com

James E. Belleau
Trafton, Matzen, Belleau & Frenette, LLP
10 Minot Avenue
Auburn, Maine 04212-0470
207-784-4531
JBelleau@TMBF-law.com

Sumner H. Lipman
Law Offices of Sumner Lipman, LLC
PO Box 836
Scarborough, Maine 04070
207-806-5006
SumnerLipman@gmail.com

*Counsel for Plaintiffs*