## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| MARK LEVESQUE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 2:19-cv-00389-JDL |
| | ) | |
| CENTRAL MAINE POWER | ) | |
| COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON MOTION TO DISMISS

On January 31, 2020, Plaintiffs Mark Levesque, Christie Decker, Michael Platt, Sylvia Krainin, and Sally Trussell (collectively, the "Plaintiffs") filed their Third Amended Complaint—a purported class action—against Defendants Iberdrola, S.A. ("Iberdrola"), Central Maine Power Company ("CMP"), Avangrid, Inc. ("Avangrid"), and Douglas Herling ("Herling"), alleging that the Defendants implemented a new metering and billing system that incorrectly measured and charged their customers for power, and that they then attempted to cover up the issues that resulted from their implementation of this allegedly defective system (ECF No. 44). On February 28, 2020, CMP, Avangrid, and Herling[1] filed a motion pursuant to Fed. R. Civ. P. 12(b)(1), asking this Court to either dismiss the Plaintiffs' Third Amended Complaint without prejudice or stay all proceedings in this action

---

[1] On August 7, 2020, Iberdrola filed a Motion to Dismiss for Lack of Jurisdiction or, in the Alternative, to Dismiss for Failure to State a Claim (ECF No. 84), asserting, among other things, that this Court lacks personal jurisdiction over it. Briefing on that matter has yet to be completed. Accordingly, Iberdrola has not formally joined in CMP, Avangrid, and Herling's motion, but it agrees that the motion should be granted.

pending the Plaintiffs' exhaustion of their state administrative remedies (ECF No. 50).  I held a hearing on the motion on September 8, 2020.  For the reasons that follow, I deny the motion.

## I.  FACTUAL BACKGROUND

The following facts come from the Third Amended Complaint, which I treat as true on a motion to dismiss, *see Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995),  as well as from exhibits submitted by CMP, which I may consider when ruling on a Rule 12(b)(1) motion, *see Gonzalez v. United States*, 284 F.3d 281, 288 (1st Cir. 2002).

CMP is an electric utility company headquartered in Augusta, Maine, that transmits and delivers electricity generated by various power suppliers to over 624,000 customers in central and southern Maine.  Herling is CMP's Chief Executive Officer.  CMP is a subsidiary of Avangrid, a New York corporation headquartered in Connecticut.   Iberdrola is a Spanish corporation that directly owns 81.5% of outstanding shares of Avangrid common stock and that exercises significant influence over Avangrid's and, consequently, CMP's business policies and decisions.

In 2011, CMP introduced a system of "smart meters" designed to measure CMP customers' use of electricity and transmit those measurements remotely, in order to dispense with the need for regular physical meter readings by CMP personnel.  In October 2017, CMP switched from its 27-year-old mainframe computer to a new "SmartCare" meter and billing system that was designed to interface with the smart meters.  Beginning the following month, roughly 97,000 CMP customers saw their bills increase by 50% or more from their prior usual monthly amount.  Approximately

2

200,000 other customers' bills increased by less than 50%. These billing increases allegedly occurred without any actual increased use of electricity by the customers.

The Third Amended Complaint further alleges that the Defendants failed to adequately test the SmartCare system prior to its rollout, including conducting "far fewer weeks of testing than planned and recommended." ECF No. 44 ¶ 72. CMP billed customers despite knowing that the SmartCare system was defective and inaccurate, and instructed CMP customer service representatives—who were understaffed following the rollout—to tell customers that the spikes in their electricity bills were caused by other factors (such as bad wiring, old appliances, cold snaps, or children's video game usage). Following their complaints, some customers faced issues such as: not receiving bills, not being able to access their online CMP accounts, receiving disconnect notices, being placed on payment arrangements that they did not agree to, having money withdrawn from their bank accounts without their consent, being sent to collections, receiving a high bill after months of no bills, and simply continuing to pay allegedly erroneously high bills. Customers also suffered harm such as: paying electricians to investigate their energy usage, purchasing new appliances, and severely limiting their energy usage.

The Third Amended Complaint names five Plaintiffs that illustrate these alleged issues.[2] For instance, Plaintiff Mark Levesque ("Levesque") alleges that his previous electricity bills were roughly $300 per month, but that after the implementation of SmartCare, they increased to over $400 per month. Between June

---

[2] Although the Plaintiffs make class action allegations, the class has yet to be certified. Therefore, I consider only the named Plaintiffs in deciding the Defendants' Motion to Dismiss.

and September 2018, he did not receive any bills, but in October 2018 he received a bill for $1587.51. Levesque was told by a CMP customer service representative in early 2018 that his bills were accurate and that the increase was his family's fault— for example, because they used an electric fireplace and a dehumidifier—despite CMP's alleged knowledge that the bills were inaccurate due to the SmartCare system. At multiple points, CMP issued disconnection notices to Levesque. The other Plaintiffs had similar experiences involving bill increases that were allegedly unrelated to their actual energy usage.

According to the Third Amended Complaint, this was not the first time an Iberdrola subsidiary had dealt with issues surrounding its billing system. In 2014, another Iberdrola subsidiary, Scottish Power, was investigated by the UK's Office of Gas and Electricity Markets ("Ofgem") after its rollout of a billing system similar to SmartCare. Over 300,000 Scottish Power customers received late or incorrect bills after the rollout of the new billing system. Scottish Power customers also experienced bill delays followed by a sudden demand for high bills to be paid, and Scottish Power call centers were overwhelmed by complaints and failed to respond to customers' issues. Ultimately, Ofgem levied a fine against Scottish Power for 18 million pounds (roughly 20-25 million dollars). The Third Amended Complaint notes that there was overlap of key employees, including Herling, between Iberdrola, Avangrid, and CMP.

In response to the many complaints from CMP customers regarding their receipt of high electricity bills following the SmartCare rollout, the Maine Public Utilities Commission ("PUC") retained the Liberty Consulting Group ("Liberty") to conduct a forensic audit of CMP's metering and billing systems. In December 2018,

Liberty published a report of its audit results.  During the course of the audit, Liberty examined data from all 650,000 CMP meters for the time period between November 2017 and April 2018, examined billing data from that period, conducted interviews with CMP management, and analyzed a statistically significant sample of CMP's meters.  Ultimately, Liberty concluded that CMP's systems were accurately metering customer usage, accurately transmitting the metered usage to the billing system, and accurately billing for that usage.  Liberty attributed the higher-than-usual bills to extreme cold weather during the winter of 2017-18 that coincided with a large increase in the price for electricity supply.  However, Liberty did note that a meter anomaly likely caused a small degree of error for a few thousand customers, and that CMP, which knew of the issue in 2014, should have more aggressively pursued efforts to remedy the anomaly.

Liberty also found that "compressed timelines leading up to go-live, the volume of exceptions and defects, insufficient reporting, and insufficient monitoring of key performance indicators post-go-live all adversely affected the rollout of SmartCare."  ECF No. 50-3 at 25. It further noted that "[l]ack of post go-live planning and management for defect resolution and staff to manage these defects created a large backlog, which still remain[ed]" as of the date of the report, and that "SmartCare went live with known defects requiring later resolution.  Defects discovered internally after go-live and in response to customer inquiries added substantially to an already substantial list."  ECF No. 50-3 at 26.

In January 2019, Herling sent a letter to CMP customers stating that the Liberty audit concluded that "all systems from meter to bill are working as intended

and bills are accurate," and that the only shortcoming identified by the Liberty audit was CMP's failure to dedicate enough "staff, training or management oversight" to ensure adequate customer service after the SmartCare rollout.  ECF No. 44 ¶¶ 113, 115.  The Third Amended Complaint alleges that this statement was false because the Liberty audit also criticized CMP's implementation of SmartCare, and not merely its customer service response following the rollout.  In May 2018, Herling also made statements to the Portland Press Herald and the Bangor Daily News that CMP had found nothing about the SmartCare system that would artificially increase customers' electricity usage.  The Third Amended Complaint alleges that these statements were also false, that Herling knew or should have known that these statements would instill a false sense of security in the minds of CMP customers and curtail their desire to challenge their bills, and that customers relied on both statements to their detriment by making their electricity payments, purchasing new appliances, paying electricians, and travelling to their properties to observe CMP's meter tests.

On February 26, 2020, the PUC released the results of an investigation into CMP's metering and billing issues, which it had begun in the spring of 2018.  The PUC noted that its investigation was "without precedent," but that the high volume of complaints and public skepticism "demanded a regulatory response."  ECF No. 50-3 at 6.  The PUC, incorporating the findings of the Liberty audit as well as other information, made two principal findings.  First, the PUC found "that aspects of CMP's management of the implementation of its billing software, known as SmartCare, were imprudent," and that "[d]ue to the flaws in the implementation,

after CMP went live with SmartCare, defects or exceptions affected tens of thousands of customers who experienced delayed bills or bill errors." ECF No. 50-3 at 5. Many of these errors were "presentment errors—that is, errors in the way information was presented on the bill, but which did not affect the amount owed as stated on the bill," and most of the errors that had financial consequences were already remedied by CMP. ECF No. 50-3 at 8. Second, the PUC found "that there is no pervasive, systemwide problem within [CMP's] metering and billing apparatus that has caused erroneous high usage on customers' bills," and that the cold snap of 2017-2018, combined with an increase in electricity costs, were the primary causes of the high bills received by customers following the SmartCare rollout. ECF No. 50-3 at 5.

As a result of the metering and billing issues surrounding CMP's SmartCare rollout, the PUC required CMP to establish an Independent Electricity-Use Audit Program, which allows eligible customers[3] to obtain an electricity usage audit by an independent third party. This program is designed to augment the PUC's Consumer Assistance and Safety Division ("CASD"), which the PUC's report stated should resolve outstanding customer complaints regarding the SmartCare billing issues through its normal complaint-resolution process. The report noted that the standard CASD complaint process "is a voluntary process," and that the report does not change

---

[3] The Independent Electricity-Use Audit Program is limited to customers who meet the following criteria: "(1) the customer participated in and fully complied with the interim payment policy *or* has previously filed a complaint relating to high usage with the CASD that remains unresolved (and fully complied with the interim payment policy if the customer availed themselves of it); (2) the customer's disputed high usage began occurring after the implementation of SmartCare; and (3) the sustained high use is ongoing through early 2020." ECF No. 50-3 at 83. The PUC's interim payment policy allowed customers whose bills were at least 25% higher than those in the same month of the prior year to defer the difference in the bill for possible future payment, pending the outcome of the PUC's investigation. Customers who did not timely pay the undisputed amounts were deemed to not be in compliance with the policy.

7

the fact that "[a] customer may attempt to pursue remedies through the civil court, instead of through the CASD, if the customer so chooses." ECF No. 50-3 at 80.

## II. PROCEDURAL HISTORY

In July 2018, Levesque commenced a class action lawsuit against CMP in the Cumberland County Superior Court, alleging a single claim of unjust enrichment based on CMP's alleged cover-up of the SmartCare billing issues. Roughly a month later, he added a number of additional plaintiffs and added Avangrid as a defendant. The case was transferred to the Business and Consumer Docket in September 2018. In February 2019, the Business and Consumer Court stayed all proceedings in the matter pending the resolution of the investigation into the overbilling claims by the PUC. On July 30, 2019, the Plaintiffs filed a Second Amended Complaint, which added new plaintiffs, added Iberdrola and Herling as defendants, and added additional claims. CMP and Avangrid filed a notice of removal to this Court on August 23, 2019.

The Plaintiffs filed their Third Amended Complaint on January 31, 2020. The Third Amended Complaint presents claims for (1) unjust enrichment; (2) breach of contract; (3) failure to comply with the laws and regulations concerning the provision and billing of electrical services pursuant to 35-A M.R.S. § 1501; (4) fraud and intentional misrepresentation by the corporate defendants; (5) fraud and intentional misrepresentation by Herling; and (6) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.A. §§ 1961-1968. On February 26, 2020, the PUC issued the result of its extensive investigation into CMP's metering and billing issues. Two days later, the Defendants filed the instant motion to dismiss

the Third Amended Complaint without prejudice or stay the proceedings pending the Plaintiffs' exhaustion of their administrative remedies.

## III.  LEGAL STANDARD

"'[T]he scope of Rule 12(b)(1) is flexible,' and it can serve as 'a procedural vehicle' for raising a variety of challenges to the court's power to hear the case." *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 8 n.6 (1st Cir. 2005) (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350, at 100-02 (3d ed. 2004). "The First Circuit . . . has analyzed claims of failure to exhaust administrative remedies under Rule 12(b)(1)." *Hendrick v. Almar, Inc.*, Civil No. 09-139-P-S, 2009 WL 2242428, at *1 (D. Me. July 26, 2009) (citing *Gonzalez v. United States*, 284 F.3d 281, 286-88 (1st Cir. 2002)), *report and recommendation adopted*, Civil No. 09-139-P-S, 2009 WL 2482173 (D. Me. Aug. 11, 2009).

"In ruling on a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), the district court must construe the complaint liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of the plaintiff." *Aversa v. United States*, 99 F.3d 1200, 1209–10 (1st Cir. 1996). Additionally, "the court may consider whatever evidence has been submitted." *Id.* at 1210; *see also Hawes v. Club Ecuestre El Comandante*, 588 F.2d 698, 699 (1st Cir. 1979) (noting the district court's discretion to determine question of jurisdiction using answers to interrogatories, deposition statements, and an affidavit).

## IV.  DISCUSSION

The Defendants contend that the doctrines of both administrative exhaustion and primary jurisdiction require the Plaintiffs to pursue all of the administrative

procedures created by the PUC prior to seeking judicial relief.  In the Defendants'
view, "the core fact" of the Plaintiffs' lawsuit is whether CMP charged its customers
for electricity they did not use.  ECF No. 50 at 2.  That issue, the Defendants contend,
is best addressed by the PUC, which has the expertise to make this fact-specific
determination.  The  Plaintiffs, on the other hand, dispute the necessity of requiring
further administrative investigation of individual claims, arguing that "the PUC has
already served its administrative function in this matter," and that "waiting on the
PUC to investigate overcharge claims of individual customers would be a waste of
time because no additional administrative expertise would apply . . . and the result
of each individual proceeding would not affect the main issues of this case," which the
Plaintiffs contend are "the presence of the systemic issues with the metering and
billing systems, and the cover up of the same."  ECF No. 70 at 1-2.

To address this matter, I first provide an overview of the doctrines of
administrative exhaustion and primary jurisdiction.   Next, I examine the
applicability of the administrative exhaustion doctrine to the instant case.  Finally, I
explore the applicability of the doctrine of primary jurisdiction.

## 1.    Administrative Exhaustion and Primary Jurisdiction

The doctrines of administrative exhaustion and primary jurisdiction are
closely-related and easily confused.  "Starkly contoured, the exhaustion doctrine
holds that 'no one is entitled to judicial relief for a supposed or threatened injury until
the prescribed administrative remedy has been exhausted.'"  *Portela-Gonzalez v.
Sec'y of the Navy*, 109 F.3d 74, 77 (1st Cir. 1997) (quoting *Myers v. Bethlehem
Shipbuilding Corp.,* 303 U.S. 41, 50-51 (1938)).  "This doctrine enables the agency to

develop a factual record, to apply its expertise to the problem, to exercise its discretion, and to correct its own mistakes, and is credited with promoting accuracy, efficiency, agency autonomy, and judicial economy." *Christopher W. v. Portsmouth Sch. Comm.,* 877 F.2d 1089, 1094 (1st Cir. 1989).

Similarly, **"**[p]ursuant to the doctrine of primary jurisdiction, a court may defer or stay litigation pending an administrative agency's consideration of the issues presented in the suit." *U.S. Pub. Interest Research Grp. v. Atl. Salmon of Me., LLC*, 257 F. Supp. 2d 407, 424 (D. Me. 2003), *aff'd*, 339 F.3d 23 (1st Cir. 2003). "The doctrine is typically applied, 'whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body.'" *Id.* (quoting *United States v. W. Pac. R.R.* (*Western Pacific*)*,* 352 U.S. 59, 64 (1956)). "The primary jurisdiction doctrine is intended to 'serve as a means of coordinating administrative and judicial machinery' and to 'promote uniformity and take advantage of agencies' special expertise.'" *Pejepscot Indus. Park, Inc. v. Me. Cent. R.R.,* 215 F.3d 195, 205 (1st Cir. 2000) (alteration omitted) (quoting *Mashpee Tribe v. New Seabury Corp.,* 592 F.2d 575, 580 (1st Cir. 1979)).

The United States Supreme Court distinguished between the doctrines of administrative exhaustion and primary jurisdiction in *Western Pacific Railroad Company*, noting that:

> The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. "Exhaustion" applies where a claim is cognizable in the first instance by an administrative agency alone;

judicial interference is withheld until the administrative process has run its course. "Primary jurisdiction," on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

352 U.S. at 63-64.

In other words, "the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate," 33 Wright & Miller, *Federal Practice & Procedure*, § 8363 (2d ed. 2020) (quoting *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 193 (1985)), while primary jurisdiction "applies to 'claims properly cognizable in court that contain some issue within the special competence of an administrative agency,'" *id.* § 8366 (quoting *Reiter v. Cooper*, 507 U.S. 258, 268 (1993)). *Compare Portela-Gonzalez*, 109 F.3d at 76 (finding that discharged Navy Exchange employee who failed to pursue the fourth level of administrative redress impermissibly failed to exhaust her administrative remedies), *with Pejepscot Indus. Park,* 215 F.3d at 205 (finding that the district court had jurisdiction over the plaintiff's claim, but staying that claim while referring it to appropriate administrative agency under the doctrine of primary jurisdiction).

2.      **The Applicability of the Doctrines**

A.      **Administrative Exhaustion**

The Defendants argue that the doctrines of both administrative exhaustion and primary jurisdiction apply to this matter.  In arguing for the application of the administrative exhaustion requirement, the Defendants contend that "this Court is neither authorized nor obligated to examine expert-laden facts concurrently with the PUC" because there exists "an administrative procedure, provided by the applicable regulatory experts, for challenging the accuracy of the charges [the Plaintiffs] received in bills from CMP."  ECF No. 50 at 7, 10.

The Defendants are correct that the Maine Legislature has granted the PUC extensive authority to regulate public utilities.  As the Law Court has noted, "[r]egulating public utilities is in the first instance the function of the Legislature, not the judiciary," and "the Legislature delegated its entire authority to regulate and control public utilities to the Public Utilities Commission." *Mech. Falls Water Co. v. Pub. Utils. Comm'n*, 381 A.2d 1080, 1090 (Me. 1977).  This includes the authority to resolve billing disputes and order reparation or adjustment in the event of an overcharge. *See* 35-A M.R.S.A. § 1308 (Westlaw through the 2019 Second Reg. Sess. of the 129th Legis.). The PUC also has the authority to conduct hearings, during which it may receive evidence, subpoena witnesses and documents, and issue orders and decisions. *See* 35-A M.R.S.A. §§ 1304-1306 (Westlaw through the 2019 Second Reg. Sess. of the 129th Legis.).

Pursuant to this authority, the PUC created the CASD, which, upon the acceptance of a proper consumer complaint, will conduct an informal investigation of

the complaint that involves a meeting with the customer, a review of the utility's investigation of the dispute, and an examination of other relevant records. 65-407 C.M.R. ch. 815, § 13(H)(2) (Westlaw through Sept. 16, 2020). As noted above, for eligible CMP customers, this process is augmented by the Independent Electricity-Use Audit Program created as a result of the PUC's investigation into CMP's billing issues. The CASD may impose remedies such as reconnection of electrical service, refunds, or credits for amounts that customers overpaid. *Id.* § 13(H)(5). A customer unsatisfied with the CASD's decision may appeal to the full PUC, which may either affirm the CASD decision, remand the complaint to the CASD for reconsideration or additional factfinding, issue an order altering the CASD decision, or open a full investigation with all of the procedures described above. *Id.* § 13(I)(1)-(4). A customer may appeal a final PUC decision to the Law Court on questions of law. 35-A M.R.S.A. § 1320 (Westlaw through the 2019 Second Reg. Sess. of the 129th Legis.).

Despite the broad authority granted to the PUC, the Legislature did not mandate that utility customers exhaust their administrative remedies prior to bringing a judicial action. In fact, 35-A M.R.S.A. § 1308 states only that dissatisfied customers *may* appeal a decision of a utility company regarding overcharging to the PUC. Moreover, 35-A M.R.S.A. § 1501 authorizes persons injured by a utility company to seek civil damages and makes no mention of administrative exhaustion. Finally, as noted above, the PUC's report on CMP's metering and billing issue specified  that "a customer may attempt to pursue remedies through the civil court, instead of through the CASD." ECF No. 50-3 at 80 (citing 35-A M.R.S.A. § 1501).

Here, the Legislature did not express that it intended for a party's grievance against a utility company to be "cognizable in the first instance by an administrative agency alone." *Western Pacific*, 352 U.S. at 63. Thus, the doctrine of administrative exhaustion does not apply.

## B.    Primary Jurisdiction

As explained above, the Plaintiffs' claims are "originally cognizable in the courts." *Id.* Moreover, the PUC has the "special competence" to decide utility billing disputes. *Id.* at 64. Accordingly, this case falls within the realm of cases in which the primary jurisdiction doctrine may apply.

The First Circuit has set forth three factors for a court to consider when determining whether or not to defer to an agency under the doctrine of primary jurisdiction: "(1) whether the agency determination lies at the heart of the task assigned the agency by [the Legislature]; (2) whether agency expertise is required to unravel intricate, technical facts; and (3) whether, though perhaps not determinative, the agency determination would materially aid the court." *Pejepscot Indus. Park*, 215 F.3d at 205 (alterations omitted) (quoting *Massachusetts v. Blackstone Valley Elec. Co.*, 67 F.3d 981, 992 (1st Cir. 1985)).

These factors weigh against deferring to the PUC in this instance. The PUC has already issued a lengthy and detailed report regarding CMP's metering and billing issues. That 86-page report is, in the PUC's own words, "nothing if not thorough." ECF No. 50-3 at 6. The report was the product of three major administrative phases: the initial summary investigation by the PUC; the extensive forensic audit conducted by Liberty which examined billing data for every CMP

customer between November 2017 and April 2018, a total of 4 million billing records and 2.3 billion data points; and the PUC's adjudicatory investigation, which involved discovery, written testimony, evidentiary hearings, and public hearings.

While, as noted above, the Legislature has squarely assigned the task of regulating public utilities and resolving billing disputes to the PUC, *see Mech. Falls Water Co.*, 381 A.2d at 1090, thereby placing a PUC determination on CMP's metering and billing issues "at the heart of the task assigned the agency by [the Legislature]," *Pejepscot Indus. Park*, 215 F.3d at 205, that agency determination has largely already occurred in this case. Similarly, while the expertise of the PUC is useful in unraveling the "intricate, technical facts" surrounding CMP's billing and metering issues, and while its determination of those facts would "materially aid the court," *id.*, the facts within the PUC's expertise have already been found, and the Court already has the benefit of those findings to aid in the adjudication of the Plaintiffs' lawsuit.

At this point, the reasons for applying primary jurisdiction have already been realized. While there are additional administrative options available to the Plaintiffs—such as review by the CASD, an Independent Energy-Use Audit for the one potentially eligible named Plaintiff, [4] and review by the full PUC—those additional  proceedings are not necessary for this Court to resolve the Plaintiffs' claims. This is because those claims are focused on the overarching question of whether a systemic failure occurred with the launch of SmartCare that led to

---

[4] At the hearing held on September 8, 2020, the Plaintiffs represented that at least four of the five named Plaintiffs do not meet the eligibility criteria for the Independent Energy-Use Audit.

erroneous metering and billing of CMP customers, and whether the Defendants misled the Plaintiffs about this failure.  As the state court noted when it stayed the case on the basis of primary jurisdiction to allow the PUC to complete its investigation, the Plaintiffs' claims are "undoubtedly within the experience of judges," and "the gravamen of [the] Plaintiffs' complaint is squarely focused on what amounts to a billing dispute between CMP and its customers."  ECF No. 1-3 at 6.  While the stay was initially necessary to allow for the PUC to conduct its investigation, *see* ECF No. 1-3 at 6 ("prudence would suggest that this court defer to the PUC's authority and refrain from proceeding in this matter until the PUC's investigation is complete"), that investigation has been concluded, and this Court now has the benefit of the PUC's findings in adjudicating this dispute.

Additionally, while not a factor enumerated by the First Circuit in its primary jurisdiction analysis, it is worth noting that the Defendants' proposed stay would halt the pending litigation for at least twelve to eighteen months.[5]  The Plaintiffs filed their complaint in July 2018—over two years prior to the Defendants' motion to dismiss.  The addition of at least another year to the already lengthy litigation process brings with it the natural risk of evidence aging, witnesses becoming unavailable, and plaintiffs scattering.  *See United States v. Marion*, 404 U.S. 307, 326 (1971) (recognizing "the real possibility of prejudice inherent in any extended delay: that

---

[5] At the hearing on September 8, 2020, the parties disputed the length of time it would take for the Plaintiffs to exhaust their administrative remedies.  The Defendants initially argued that the Plaintiffs could complete the CASD process within a matter of months, but then agreed that it would take between twelve and eighteen months for the Plaintiffs to make it through the CASD process, the Independent Electricity-Use Audit Program, a hearing before the full PUC, and an appeal to the Law Court.  The Plaintiffs contend that the likelihood that they could complete the CASD process within a year is low, and that it would take at least eighteen months to resolve their cases should they bring them through the full PUC review and Law Court appeal process.

memories will dim, witnesses become inaccessible, and evidence be lost"). Given the minimal insight that additional PUC proceedings would likely provide, this prejudice to the Plaintiffs—while certainly not dispositive—weighs against imposing a stay in this case.

This is not a case that requires a stay in deference to an administrative body under the primary jurisdiction doctrine. While the PUC is Maine's administrative authority on utilities regulation, its expertise has already been brought to bear, and this Court is fully equipped to adjudicate the Plaintiffs' claims with the benefit of the extensive findings the PUC has rendered.

## V. CONCLUSION

For the reasons discussed above, the Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint Without Prejudice or to Stay Proceedings Pending Exhaustion of Administrative Remedies (ECF No. 50) is **DENIED.**


**SO ORDERED.**

**Dated:  November 25, 2020**


             **/s/ JON D. LEVY**
           **CHIEF U.S. DISTRICT JUDGE**