## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **MARK LEVESQUE, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **2:19-cv-00389-JDL** |
| | ) | |
| **IBERDROLA, S.A., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER ON MOTIONS TO DISMISS

Plaintiffs Mark Levesque, Christie Decker, Michael Platt, Sylvia Krainin, and Sally Trussell (collectively, the "Plaintiffs") filed their Third Amended Complaint—a putative class action—against Defendants Iberdrola, S.A. ("Iberdrola"); Central Maine Power Company ("CMP"); Avangrid, Inc. ("Avangrid"); and Douglas Herling ("Herling") (collectively, the "Defendants") on January 31, 2020 (ECF No. 44). The Third Amended Complaint alleges that the Defendants implemented a metering and billing system that incorrectly measured and charged customers for electricity, and that they then attempted to cover up problems that resulted from their implementation of this allegedly defective system.

On August 7, 2020, Iberdrola filed a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) or, in the alternative, for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF No. 84). On February 1, 2021, Avangrid and CMP jointly filed a motion to dismiss for failure to state a claim (ECF No. 128). That same day, Herling also filed a motion

1

to dismiss for failure to state a claim (ECF No. 129). For the reasons that follow, I grant the motions in part and deny them in part.

## I. FACTUAL BACKGROUND

CMP is an electric utility headquartered in Augusta, Maine that transmits and delivers electricity generated by various power suppliers to over 624,000 customers in central and southern Maine. Herling is CMP's Chief Executive Officer. CMP is a subsidiary of Avangrid, a New York corporation headquartered in Connecticut. Iberdrola is a Spanish corporation that owns the majority of outstanding shares of Avangrid common stock.

In 2011, to dispense with the need for physical meter readings, CMP introduced a system of "smart meters" designed to measure CMP customers' use of electricity and transmit those measurements remotely. In October 2017, CMP switched to a new "SmartCare" meter and billing system that was designed to interface with the smart meters. Beginning the following month, nearly 300,000 CMP customers saw their bills increase, many by 50% or more. These billing increases allegedly occurred without any actual increased use of electricity by the customers.

The Third Amended Complaint alleges that the Defendants failed to adequately test the SmartCare system prior to rollout, including conducting "far fewer weeks of testing than planned and recommended." ECF No. 44 ¶ 72. CMP allegedly billed customers despite knowing that the SmartCare system was defective and inaccurate, and instructed CMP customer service representatives (who were understaffed following the rollout) to tell customers that the spikes in their electricity

bills were caused by other factors.  Following their complaints, some customers faced issues such as: not receiving bills, not being able to access their online CMP accounts, receiving disconnect notices, being placed on payment arrangements that they did not agree to, having money withdrawn from their bank accounts without their consent, being sent to debt collectors, receiving a high bill after months of no bills, and simply continuing to pay allegedly erroneously high bills.  Customers also suffered indirect harm, such as paying electricians to investigate their energy usage, purchasing new appliances, and severely limiting their energy usage.

According to the Third Amended Complaint, this was not the first time an Iberdrola subsidiary had dealt with issues surrounding its billing system. In 2014, another Iberdrola subsidiary, Scottish Power, was investigated by the United Kingdom's Office of Gas and Electricity Markets ("Ofgem") after its rollout of a billing system similar to SmartCare.  Scottish Power customers received late or incorrect bills and experienced bill delays followed by a sudden demand for high bills to be paid, and Scottish Power call centers were overwhelmed by complaints and failed to respond to customers' issues.  Ultimately, Ofgem fined Scottish Power.

The Third Amended Complaint also alleges that there was an overlap of key employees between Iberdrola, Avangrid, and CMP.  The SmartCare project was led by a team that included Iberdrola employees, including employees located in Maine. Iberdrola exercised significant influence over CMP and Avangrid, and the SmartCare project was implemented at Iberdrola's direction.  At least one Avangrid employee was also involved in the Scottish Power billing system rollout.

In response to complaints from CMP customers regarding their receipt of high electricity bills following the SmartCare rollout, the Maine Public Utilities Commission ("PUC") retained the Liberty Consulting Group ("Liberty") to conduct a forensic audit of CMP's metering, billing, and related systems.[1]  In December of 2018, Liberty published a report of its audit.  Ultimately, Liberty concluded that "CMP's meters produce accurate measurements of customer usage."  ECF No. 14-6 at 15. Liberty found that SmartCare "introduced errors and significant delay into the billing process," but that these billing errors were "minimal in number and in dollar value." *Id.*  Liberty criticized the "testing and training" surrounding the SmartCare implementation, along with the personnel shortages that "unduly delayed fixes to the errors, caused significant customer difficulty in reaching CMP representatives and in getting answers to questions and concerns, and meant overly long delays in resolving billing problems."  *Id.*  It noted that "compressed timelines leading up to go-live" adversely affected the rollout of SmartCare**,** *id.* at 77, and that "[l]ack of post go-live planning and management for defect resolution and staff to manage these defects created a large backlog, which still remain[ed]" as of the date of the report, *id.* at 81. However, Liberty ultimately attributed CMP's customers' high bills to extreme cold weather during the winter of 2017-2018 that coincided with an increase in the price of electricity**.**

---

[1] The information in this paragraph stems from the Liberty Consulting Group's forensic audit of CMP's Metering and Billing System, ECF No. 14-6 at 5-111.  *See Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993) (noting that courts considering a motion to dismiss may look to documents that are "central to plaintiffs' claim" or "sufficiently referred to in the complaint").

In January 2019, Herling sent a letter to CMP customers stating that the Liberty audit concluded that "all systems from meter to bill are working as intended and bills are accurate," and that the only shortcoming identified by the Liberty audit was CMP's failure to dedicate enough "staff, training[,] or management oversight" to ensure adequate customer service after the SmartCare rollout.  ECF No. 44 ¶¶ 113, 115.  The Third Amended Complaint alleges that this statement was false because the Liberty audit also identified problems with CMP's implementation of SmartCare, and not merely its customer service following the rollout.  In May 2018, before the Liberty report was issued, Herling also made statements to the Portland Press Herald and the Bangor Daily News indicating that CMP had found nothing about the SmartCare system that would artificially increase customer's usage.  The Third Amended Complaint alleges that these statements were also false, that Herling knew or should have known that these statements would instill a false sense of security in the minds of CMP customers and curtail their desire to challenge their bills, and that customers relied on both statements to their detriment by making their electric payments, purchasing new appliances, paying electricians, and travelling to observe CMP's meter testings.

## II. PROCEDURAL HISTORY

In July 2018, Levesque commenced a class action lawsuit against CMP in the Cumberland County Superior Court, alleging a single claim of unjust enrichment based on CMP's alleged cover-up of the SmartCare billing issues.  Roughly a month later, he added a number of additional plaintiffs and added Avangrid as a defendant. The case was transferred to the Superior Court's Business and Consumer Docket in

September 2018.  In February 2019, the Superior Court stayed all proceedings in the matter pending the resolution of an investigation into the overbilling claims by the PUC.  On July 30, 2019, the Plaintiffs filed a Second Amended Complaint, which added new named plaintiffs, added Iberdrola and Herling as defendants, and added additional claims.  CMP and Avangrid filed a notice of removal to this court on August 23, 2019.

The Plaintiffs filed their Third Amended Complaint on January 31, 2020.  The Third Amended Complaint presents claims for (1) unjust enrichment; (2) breach of contract; (3) failure to comply with the laws and regulations concerning the provision and billing of electrical services pursuant to 35-A M.R.S.A. § 1501 (West 2021); (4) fraud and intentional misrepresentation by the corporate defendants; (5) fraud and intentional misrepresentation by Herling; and (6) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.A. §§ 1961-1968.  On February 26, 2020, the PUC issued the result of its investigation into CMP's metering and billing issues.  CMP, Avangrid, and Herling then filed a motion to dismiss the Third Amended Complaint without prejudice or to stay the proceedings pending the Plaintiffs' exhaustion of administrative remedies on February 28, 2020.  Following a hearing, I denied the motion on November 25, 2020 (ECF No. 104).

I now address three additional motions to dismiss.  Iberdrola has filed a motion to dismiss for lack of personal jurisdiction or, in the alternative, for failure to state a claim.  CMP and Avangrid have also filed a motion to dismiss for failure to state a claim, as has Herling.  I held a consolidated hearing on all three motions on May 20, 2021.

6

### III. LEGAL STANDARDS

**A.      Rule 12(b)(1): Lack of Personal Jurisdiction**

"To hear a case, a court must have personal jurisdiction over the parties, that is, the power to require the parties to obey its decrees." *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.,* 290 F.3d 42, 50 (1st Cir. 2002) (internal citation and quotation marks omitted). "The plaintiff bears the burden of proving the court's personal jurisdiction over the defendant." *Id.* However, this burden is "not a heavy one." *In re Lupron Mktg. and Sales Practices Litig.*, 245 F. Supp. 2d 280, 289 (D. Mass. 2003). While "[t]he plaintiff must go beyond the pleadings and make affirmative proof," *Negrón-Torres v. Verizon Commc'ns, Inc.*, 478 F.3d 19, 23 (1st Cir. 2007) (quoting *Boit v. Gar–Tec Prods., Inc.,* 967 F.2d 671, 675 (1st Cir. 1992)), under the prima facie standard, a court "must accept the plaintiff's (properly documented) evidentiary proffers as true," and construe those facts "in the light most congenial to the plaintiff's jurisdictional claim." *Daynard*, 290 F.3d at 51 (citations and quotation marks omitted). Facts put forth by the plaintiff must be accepted as true "irrespective of whether the defendant disputes them," and "facts put forward by the defendant 'become part of the mix only to the extent they are uncontradicted.'" *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 8 (1st Cir. 2009) (quoting *Adelson v. Hananel*, 510 F.3d 43, 48 (1st Cir. 2007)).

**B.      Rule 12(b)(6): Failure to State a Claim**

A court reviewing a motion to dismiss for failure to state a claim must "accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor." *Rodríguez-Reyes v. Molina-Rodriguez*,

711 F.3d 49, 52-53 (1st Cir. 2013) (quoting *Santiago v. Puerto Rico*, 655 F.3d 61, 72 (1st Cir. 2011)).  To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the complaint "must contain sufficient factual matter to state a claim to relief that is plausible on its face."  *Id.* at 53 (quoting *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 44 (1st Cir. 2012)).

Courts apply a two-pronged approach in resolving a motion to dismiss under Rule 12(b)(6).  *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).  First, courts must identify and disregard statements in the complaint that merely offer legal conclusions couched as factual allegations.  *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Second, courts "must determine whether the remaining factual content allows a reasonable inference that the defendant is liable for the misconduct alleged."  *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 80 (1st Cir. 2013) (quotation marks and citation omitted).  Determining the plausibility of a claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* (quoting *Iqbal*, 556 U.S. at 679).

## IV. LEGAL ANALYSIS

Because Iberdrola raises the threshold issue of personal jurisdiction, I address this question first.  I then address the various parties' arguments as to whether the Third Amended Complaint states a claim for unjust enrichment, fraud and misrepresentation, violation of 35-A M.R.S.A. § 1501, or violation of RICO, as

applicable, beginning with the broad argument that all state law claims against Avangrid must be dismissed.[2]

## A.  Personal Jurisdiction over Iberdrola

The parties have engaged in a lengthy discovery process with respect to Iberdrola's motion.  Accordingly, their factual submissions are extensive and detailed. I summarize the facts specific to jurisdiction here, presenting them in the light most favorable to the plaintiffs, as I must, and giving deference to the plaintiffs where Iberdrola has presented conflicting factual allegations.  I then analyze the parties' jurisdictional arguments.

### 1.  Factual Allegations

Iberdrola, a corporation organized and headquartered in Spain, owns 81.5% of the shares of its American brand Avangrid, which in turn owns 100% of the shares of CMP.  Iberdrola does not have any offices, property, or bank accounts in the United States, is not licensed to do business in the United States, and does not have any permanent employees in the United States.  However, certain Iberdrola officers are also officers of Avangrid.  Ignacio Galán is chairman of both Iberdrola and Avangrid. Avangrid's Board of Directors includes Pedro Azagra Blázquez, who is Iberdrola's Corporate Development Director; José Sainz Armada, who serves in a senior financial management role at Iberdrola; and Santiago Martínez Garrido, who serves in a senior legal role for Iberdrola.  Several of these individuals have travelled to Maine multiple

---

[2] No party has challenged the claim for breach of contract alleged in Count Two of the Third Amended Complaint, except for Avangrid in the context of its argument that all claims against it must fail. Additionally, the Plaintiffs have voluntarily dismissed their 35-A M.R.S.A. § 1501 and RICO claims against Iberdrola.

times since 2015 to speak about, promote, conduct, and advocate for Iberdrola's business interests in Maine. In a Securities and Exchange Commission filing, Avangrid explained that "Iberdrola exercises significant influence over [Avangrid], and its interests may be different than [other shareholders']." ECF No. 16-21 at 47. It further stated that Iberdrola "exercise[s] significant influence over [Avangrid's] business policies and affairs, including the composition of [its] board of directors." *Id.*

A former employee of Avangrid's treasury department, Valery Harris, states that, during the implementation of the SmartCare project, at least six Iberdrola employees were based in Maine at any given time to work on the project, particularly in the lead up to SmartCare's go-live in October 2017.[3] Avangrid reimbursed Iberdrola for the payroll and housing costs for each employee's time spent working at CMP/Avangrid. Iberdrola had an account in the Netherlands where its subsidiaries deposited their revenues, and CMP/Avangrid could draw from that account if Iberdrola found it necessary. Iberdrola selected the technical consultant for the SmartCare project, and for the similar project in Scotland. Additionally, CMP/Avangrid were required to complete and submit request forms for the purchase of, among other things, equipment, software, supplies, software add-ons, and firmware for Iberdrola's approval. This included approval for expenditures on the SmartCare project. The necessity of Iberdrola's approval led to delays with the SmartCare project. Additionally, Fernando Lucero, Iberdrola's Chief Information

---

[3] In a procedural order dated April 28, 2021 (ECF No. 157), Magistrate Judge John C. Nivison ruled that the sworn declaration of Valery Harris, a 2015 Capital Expenditure Plan, and the pleadings and order regarding the Plaintiff's motion for sanctions against Iberdrola shall be included in the record for the Court's consideration of Iberdrola's motion to dismiss. No objections to the Magistrate Judge's order have been filed. Accordingly, Iberdrola's Response to Plaintiffs' Notice of New Developments (ECF No. 126), which is addressed by the Magistrate Judge's order, is denied as moot.

Officer, was "deeply involved with Avangrid's Information Technology assets and programs including the SmartCare project in Maine."  ECF No. 120-1 ¶ 21.

A 2015 Capital Expenditure Plan, entitled "CMP Customer Relationship Management & Billing Project," states that the SmartCare project was "proposed by" Lucero and Sainz Armada.  ECF No. 120-2 at 1.  It also states that, following approval by the PUC, the plan was to "be updated and re-presented to the Iberdrola Operating Committee for full approval before project launch."  *Id.* at 9.  A SmartCare "Project Kickoff Meeting" handout states that "[t]he Operating Committee of Iberdrola's Group approved in 2015 the implementation" of SmartCare.  ECF No. 118-5 at 7.

In addition to its more overarching role, Iberdrola was involved at several points of the SmartCare rollout.  For instance, when SmartCare was delayed in June 2016, an Avangrid executive told another executive that they were "being directed by global IT to get bids from other vendors" which "would cause at least a month's delay, possibly more."  ECF No. 125 at 4.  He further explained that concerns about the project could be "escalated" to "Armando Martinez [of Iberdrola] so it could blow up at a very senior level.  Fernando [Lucero] is very concerned about this."  *Id.*  A few weeks later, after being informed about a potential delay with SmartCare's implementation, Lucero wrote in an email: "We have never talked about any delay impacting the go-live.  I [do] not accept it.  Please, provide me this week a plan with options for infrastructure workstreams in order to recover the delay and keep the agreed go-live."  *Id.* at 7.  Lucero later informed a CMP project manager that "[w]e must solve all the issues asap."  *Id.* at 8.

In April 2017, Ignacio Canales, an Iberdrola employee assigned to the SmartCare project, informed a CMP executive that Jaime Macias Gonzalez (Iberdrola's SmartCare emissary based in Maine and a member of the SmartCare project lead team) would provide her with key performance indicators that Iberdrola used in other projects to identify and understand the "potential bottlenecks in the system after the go-live," including integration and billing errors. *Id.* at 32. And in August 2017, in response to reports of likely delays, Iberdrola executive Armando Martinez emailed Avangrid Chief Executive Officer Robert Kump the following:

> What are the regulatory consequences of any delay? And the economic impac[t] (which must be transfer[ed] to ITRON)? This project should have finished last July. Delays [from] September are not acceptable. The team must work on a[] scenario of September completion, unless non regulatory, economic or reputational impact.

*Id.* at 1.

For its part, Iberdrola states that only two of its employees—Macias Gonzalez and Canales—had a notable connection to the SmartCare project, and states that their roles were limited to "back office" integration of SmartCare with Iberdrola's global platform. ECF No. 84-1 ¶ 16. It states that Macias Gonzalez moved to Maine for a period of time to assist with the project, but that Macias Gonzalez only reported to Canales at Iberdrola, and that with respect to SmartCare he reported to superiors at CMP, rather than CMP employees reporting to him. Iberdrola claims that Macias Gonzalez was the local resource for CMP to interface with a software development team located in Spain to ensure that the team was devoting the proper resources to the SmartCare project.

While Iberdrola acknowledges that Iberdrola employees were on the SmartCare Steering Committee, it states that the Steering Committee was only "tasked with monitoring strategic priorities for the [SmartCare] project, demonstrating project sponsorship, reviewing and accepting project status updates at regular intervals, and securing appropriate project resources," and notes that "[t]he Steering Committee did not exercise decision-making authority and instead provided a forum for the project team to provide informational status updates to various stakeholders on the progress of the SmartCare project." *Id.* ¶ 21. Canales was the only Iberdrola employee to participate in a Steering Committee meeting and he did so remotely from Spain and "infrequently." *Id.* ¶ 23.  Other Iberdrola employees served on the committee for only "a couple of months" and did not participate. *Id.* ¶ 22.  Macias Gonzalez was not on the Steering Committee, but, as a member of the SmartCare project lead team, he did participate in Steering Committee meetings "infrequently" in "an information-providing role." *Id.* ¶ 29.

Iberdrola claims that the services of Canales and Macias Gonzalez were consistent with Iberdrola's "Framework Agreement for the Provision of Corporate Services for Iberdrola and the Companies of Its Group," which states that "without detriment to the autonomous decision-making of all such companies," Iberdrola may provide "efficient, flexible corporate services" at the request of any subsidiary company in order to assist with "the global integration of [Iberdrola's] businesses." *Id.* ¶ 17 (emphasis omitted).  The Agreement expressly provides that all services "shall be provided by [Iberdrola] . . . without detriment to the effective decision-making capacity of the Client Companies." *Id.*

### 2.     Analysis

The Plaintiffs have essentially set forth two theories of jurisdiction.  First, they argue that this court has personal jurisdiction over Iberdrola as a parent company because of its "general level of control," ECF No. 118 at 19, over its subsidiaries CMP and Avangrid—essentially, an argument that CMP/Avangrid, neither of which have contested jurisdiction, are the "domestic alter ego" of Iberdrola.[4]  *City of Bangor v. Citizens Commc'ns Co.*, No. CIV. 02-183-B-S, 2003 WL 22183205, at *5 n.5 (D. Me. Sept. 22, 2003), *report and recommendation adopted*, No. CIV. 02-183-B-S, 2003 WL 22913423 (D. Me. Dec. 1, 2003).  Next, they argue that Iberdrola itself had the requisite minimum contacts necessary to establish specific personal jurisdiction.

#### a.     The "Domestic Alter Ego" Theory

For a court to assert personal jurisdiction over a parent company on a "domestic alter ego" theory, a plaintiff "must produce 'strong and robust' evidence of control by the parent company over the subsidiary, rendering the latter a 'mere shell.'" *Negrón-Torres*, 478 F.3d at 24 (quoting *DeCastro v. Sanifill, Inc.,* 198 F.3d 282, 283-84 (1st Cir. 1989)).

In *City of Bangor*, Magistrate Judge Margaret J. Kravchuk explained the "sometimes overlapping scenarios" where courts will exercise jurisdiction over a parent based on the forum activities of its subsidiaries:

---

[4] While "[d]ue process requires the plaintiff to prove the existence of either general or specific jurisdiction," *Negrón-Torres,* 478 F.3d at 24, in a "domestic alter ego" inquiry "the general versus specific jurisdiction issue may be of little significance because [CMP/Avangrid's] forum contacts are more than sufficient to support an exercise of either specific or general jurisdiction."  *City of Bangor*, 2003 WL 22183205, at *5 n.5.

(1) the parent exercises pervasive or complete control over the subsidiary, either in regard to its day-to-day operations or in regard to the specific, claim-related conduct; (2) the subsidiary is the parent's in-state agent, instrumentality or a mere department of the parent; (3) the parent and subsidiary engage in a common undertaking in a manner that substantially disregards the separate nature of the corporate entities or creates serious ambiguity about the same; (4) the parent's representatives maintain a near constant presence in the state in order to deal directly with those entities the subsidiary conducts business with coupled with other factors reflecting a systematic pattern of in-state activity comparable to the conduct of a domestic corporation; or (5) traditional veil-piercing factors, including failure to observe corporate formalities, inadequate capitalization, commingling of funds, overlapping ownership, officers, directors and personnel, and so forth.

*City of Bangor,* 2003 WL 22183205, at *3. In that case, among other factors, the foreign corporation was a holding company that owned 100% of the stock of a Maine corporation. *See id.* at *3-4. The holding company's four owners were the only members of the Maine corporation's board of directors, and an individual who held himself out to be the Vice President of the Maine corporation was in reality the Vice President of the foreign corporation. *See id.* at *4-5. The Maine company failed to file its annual report in Maine as required by law, and the foreign company had previously been found to have disregarded corporate formalities in a separate lawsuit. *See id.* Finally, the foreign company had "active, repeat participation . . . in brokering its subsidiary's Maine real estate transactions." *Id.* at *5.

The facts of this case do not rise to the level of the facts in *City of Bangor*. While there was some overlap between the Boards of Directors of Iberdrola and Avangrid, Iberdrola did not constitute the entirety—or even the majority—of the Avangrid Board of Directors. While the Third Amended Complaint references a

metering system rollout in Scotland with similar failures as the SmartCare rollout, the Plaintiffs have not alleged that there has been any formal finding that Iberdrola has disregarded its corporate formalities in the past or that it otherwise exercised "pervasive or complete control" over Scottish Power. *City of Bangor,* 2003 WL 22183205, at *3. Although, as I will discuss below, Iberdrola was involved in the SmartCare rollout, that involvement does not appear to rise to the level of rendering CMP/Avangrid a "mere shell" of Iberdrola. Accordingly, the argument that Iberdrola is subject to this Court's personal jurisdiction on a "domestic alter ego" theory is unpersuasive.

### b.    The Minimum Contacts Theory

Even if CMP/ Avangrid are not the "domestic alter ego" of Iberdrola, Iberdrola's direct contacts with Maine may be sufficient to give rise to specific personal jurisdiction. "Specific personal jurisdiction may be asserted where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts." *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.* (*United Elec.*), 960 F.2d 1080, 1088-89 (1st Cir. 1992). "To determine whether [a] plaintiff has alleged facts sufficient to support a finding of specific personal jurisdiction, this circuit divides the constitutional analysis into three categories: relatedness, purposeful availment, and reasonableness. Critically, an affirmative finding on each of the three elements of the test is required to support a finding of specific jurisdiction." *Negrón-Torres,* 478 F.3d at 24–25 (internal citations, quotation marks, and alterations omitted). I address each element in turn.

###### i.      Relatedness

The First Circuit has explained that "[c]ausation is central" in determining whether the plaintiff's claims are related to the defendant's forum state activities. *Harlow v. Children's Hosp.*, 432 F.3d 50, 62 (1st Cir. 2005).[5]

> The relatedness requirement is not an open door; it is closely read, and it requires a showing of a material connection.  [The First Circuit] steadfastly rejects the exercise of personal jurisdiction whenever the connection between the cause of action and the defendant's forum-state contacts seems attenuated and indirect. . . . A broad 'but-for' argument is generally insufficient.  Because 'but for' events can be very remote, due process demands something like a proximate cause nexus.

*Id.* at 61 (internal citations, quotation marks, and alterations omitted).  In other words, "[t]here must be more than just an attenuated connection between the contacts and the claim; 'the defendant's in-state conduct must form an important, or [at least] material, element of proof in the plaintiff's case.'" *Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 27 (1st Cir. 2008) (quoting *Harlow*, 432 F.3d at 61).

Iberdrola focuses primarily on this element, arguing that the "Plaintiffs fail to establish even 'but for' causation," ECF No. 84 at 17, much less the proximate cause-like "nexus" needed to meet the relatedness requirement, *Harlow*, 432 F.3d at 61. Iberdrola leans heavily on the First Circuit's decision in *Negrón-Torres*, 478 F.3d 19.

---

[5] In March of 2021—the month after Iberdrola's motion to dismiss was fully briefed—the Supreme Court issued *Ford Motor Co. v. Montana Eighth Judicial Dist.*, 141 S. Ct. 1017 (2021).  The Court explained that the plaintiff's proposed "causation-only approach finds no support" in the relatedness inquiry, and that "[n]one of [its] precedents ha[ve] suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do."  *Id.* at 1026.  Accordingly, the Court noted that "some relationships will support jurisdiction without a causal showing."  *Id.*

Because the First Circuit has yet to address what *Ford Motor Co.* means for the test articulated in *Harlow*—and because, even applying this stricter relatedness standard, I conclude that this Court has personal jurisdiction over Iberdrola—I analyze the parties' arguments under the *Harlow* standard.

In that case, a plaintiff who had unsuccessfully attempted to dial 9-1-1 during her husband's medical crisis filed a wrongful death suit against Verizon Communications after its subsidiary inadvertently disconnected the 9-1-1 system of Puerto Rico while attempting to address a customer service complaint.  *See id.* at 22.  The plaintiff argued that Verizon directed the management and policies of its subsidiary, however, the only evidence the plaintiff put forward was a licensing agreement which purported to show that Verizon gave its subsidiary advice as to how to maintain its 9-1-1 system.  *See id.* at 25.  The court found that Verizon was not actually a party to this agreement, and noted that the plaintiff's "conclusory allegations" of control were not enough to meet the relatedness requirement.  *Id.*

Iberdrola claims that it is similarly situated to Verizon—in other words, that it is merely "a holding company that did not provide advice or direction related to the [SmartCare project]."  ECF No. 84 at 18.  However, the Plaintiffs in this case have asserted substantially more than conclusory allegations.  The Plaintiffs have put forth "affirmative proof," *Negrón-Torres*, 478 F.3d at 23, that multiple Iberdrola employees were involved with the SmartCare rollout, including employees in Maine; that Iberdrola sought to integrate SmartCare into its global system, and that a previous SmartCare project by an Iberdrola subsidiary in Scotland had been saddled with similar issues as those alleged to have occurred in Maine; and, most crucially, that Iberdrola employees directed its Maine subsidiaries, CMP and Avangrid, to avoid any further delays with SmartCare's go-live.  An Iberdrola executive directly told the SmartCare executive team that "[d]elays . . . are not acceptable," and that the team had to work toward a September completion of the project.  ECF No. 118-1

at 1.  Taking as true the Plaintiffs' contention that the SmartCare rollout was flawed and led to erroneously high billing of some of CMP's customers, there appears to be a direct line of causation between Iberdrola's executive oversight of the SmartCare project and the ultimate harm alleged by the Plaintiffs.  While Iberdrola may not have had as large of a role in SmartCare's alleged problems as CMP/Avangrid, its role was at least material to SmartCare's allegedly rushed rollout.

### ii.    Purposeful Availment

For a court to have specific jurisdiction over a defendant, the defendant must have "purposefully availed itself of 'the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable.'" *Phillips*, 530 F.3d at 28 (quoting *Daynard*, 290 F.3d at 61).

> [P]urposeful availment involves both voluntariness and foreseeability.  Voluntariness requires that the defendant's contacts with the forum state proximately result from actions by the defendant *himself*.  The contacts must be deliberate, and not based on the unilateral actions of another party.  Foreseeability requires that the contacts also must be of a nature that the defendant could reasonably anticipate being hailed into court there.

*Id.* (internal citations and quotation marks omitted).

Iberdrola addresses this factor only in a footnote, citing cases from other circuits where parent companies that did not conduct any business or maintain any offices in the forums were found not to have purposefully availed themselves of those forums.  *See Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1274 (6th Cir. 1998); *Am. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert  S.A.*, 94 F.3d 586, 590 (9th Cir. 1996).

However, much like the relatedness analysis, this case is different from the case of a parent company that merely owns a subsidiary in the forum but conducts no business in that forum. Here, multiple Iberdrola employees worked on the SmartCare project, including at least one employee that partially relocated to Maine for the task. It was certainly the voluntary, deliberate act of Iberdrola to send its employees to Maine to work on the SmartCare project, to incorporate the SmartCare project in Maine into its global system, and to direct CMP/Avangrid employees as to the timing of the SmartCare rollout. Accordingly, I conclude that Iberdrola did purposefully avail itself of this forum.

### iii.   Reasonableness

Finally, the exercise of personal jurisdiction over a defendant must be reasonable. The Supreme Court has identified a series of "gestalt factors" that the court should consider in determining reasonableness:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

*Ticketmaster-N.Y., Inc. v. Alioto*, 26 F.3d 201, 209 (1st Cir. 1994) (citing *Burger King v. Rudzewicz*, 471 U.S. 462, 477 (1985)). "The gestalt factors are not ends in themselves, but they are, collectively, a means of assisting courts in achieving substantial justice." *Id.*

Iberdrola argues that because it is based in Spain, the burden of defending this case in Maine would be substantial. It further argues that Maine "has a relatively

weak interest in an adjudication of a foreign company's potential liability vis-à-vis its own subsidiaries."  ECF No. 84 at 19 (citation and internal quotation marks omitted). It states that its inclusion in this case is not necessary for the Plaintiffs to obtain relief, and that its inclusion "would only create a parallel litigation concerning Iberdrola's role that has no ultimate relevance to whether Plaintiffs were harmed and whether they are entitled to recover."  *Id.* at 20.  As I will explain, these arguments are not persuasive.

While Iberdrola is located in Spain, it clearly has the resources to have its representatives travel to Maine, as it is a global energy company that has sent its executives and employees to Maine on many occasions.  As the Plaintiffs note, the judiciary's response to the COVID-19 pandemic has also demonstrated that many preliminary stages of civil proceedings can effectively be conducted by video or telephone when travel is not possible.  In addition, this is a case in which Maine has an exceptional interest in adjudicating this case, as Iberdrola owns and influences the largest public utility in the state, which is alleged to have harmed thousands of Maine customers.  Maine is where all of the Plaintiffs and CMP are located, and is clearly the forum best-suited to resolve this dispute.

Ultimately, I conclude that this Court has the authority to exercise specific personal jurisdiction over Iberdrola based on its active, targeted involvement in the SmartCare rollout in Maine.

## B.    All State Law Claims Pertaining to Avangrid

Avangrid argue that all state law claims against Avangrid must fail because the Third Amended Complaint does not allege any wrongdoing by the company.  They

note that the Third Amended Complaint makes no allegation that Avangrid had a contract with the Plaintiffs, made statements to the Plaintiffs, or was enriched by the Plaintiffs in any way.

The Plaintiffs argue that Avangrid is liable for the actions of CMP on the theories of both veil-piercing and agency.[6]  I address both arguments.

### 1.      Veil-Piercing

"[B]efore a court may pierce the corporate veil, a plaintiff must establish that: (1) the defendant abused the privilege of a separate corporate identity; and (2) an unjust or inequitable result would occur if the court recognized the separate corporate existence." *Johnson v. Exclusive Props. Unlimited*, 1998 ME 244, ¶ 6, 720 A.2d 568, 571.  The Law Court has pointed toward several factors which may indicate that the corporate form has been abused and should be disregarded:

> (1) common ownership; (2) pervasive control; (3) confused intermingling of business activity, assets, or management; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporate assets by the dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud.

*Johnson*, 1998 ME 244, ¶ 7, 720 A.2d at 571 (alterations omitted) (quoting *George Hyman Constr. Co. v. Gateman*, 16 F. Supp. 2d 129, 149-50 (D. Mass. 1998)).

---

[6]  On March 3, 2021, five days before the reply deadline, the Plaintiffs filed an unopposed motion to file a thirty-page reply to CMP/Avangrid's motion to dismiss, which is ten pages in excess of the twenty-page limit (ECF No. 144).  The Court, by an administrative oversight, did not address the motion before the reply deadline, and the Plaintiffs ultimately filed a twenty-two page reply (excluding the signature block and certificate of service).  Because the issue is no longer live, I deny the motion as moot.

The Third Amended Complaint alleges that "[f]rom the time that Iberdrola acquired [Avangrid] moving forward, there was a continuous team of people in [Avangrid's] New Gloucester, Maine corporate office from Iberdrola's home office in Spain." ECF No. 44 ¶¶ 45. It states that meetings were held in Avangrid's New Gloucester, Maine offices with Iberdrola representatives in or around 2008 informing Avangrid and CMP employees that Avangrid was selling the company to Iberdrola, but that employees were not to share this information. "All of the regulated assets, accounting for all investments, vendor payments, payroll, and virtually everything involving money, was processed through the New Gloucester, Maine corporate office." *Id.* ¶¶ 48-50. According to the Third Amended Complaint, the employees working at the New Gloucester, Maine office "knew no distinction" between Iberdrola, CMP, and Avangrid. *Id.* ¶ 62. CMP implemented SmartCare "at the direction of Iberdrola and with the full cooperation of Avangrid." *Id.* ¶ 69. Avangrid employees—as well as Iberdrola employees placed in Avangrid's New Gloucester office—were part of the team that led the SmartCare rollout.

While the Third Amended Complaint paints a picture of an involved parent company, it does not allege the abuses of the corporate form that a veil-piercing theory would require. While Avangrid may have been involved in the SmartCare rollout— and while it may have at times been difficult for employees to distinguish the various corporate identities of CMP and its parent companies from one another—the Plaintiffs have not alleged the lack of corporate formalities, improper record-keeping, financial distress, or confused intermingling of business activities that would allow this court to impute CMP's actions to Avangrid on a veil-piercing theory. Accordingly,

I do not find that Avangrid has abused the privilege of its separate corporate identity to the extent that it should be held liable for CMP's actions on a veil-piercing theory.

### 2. Agency

The Plaintiffs also argue that Avangrid is liable for the acts of CMP on an agency theory.

The District of Massachusetts has explained that:

> Generally, for an agency relationship to exist, there must be an agreement between two people that one will act on the other's behalf and subject to his or her control. *Restatement (Second) of Agency* § 1 (Am. Law Inst. 1958). "Whether such an agency is formed depends on the actual interaction between the putative principal and agent, not on any perception a third party may have of the relationship." *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.,* 909 F.2d 698, 702 (2d Cir. 1990). Although subsidiaries do not always act as agents of the parents, in some cases the facts establish an agency relationship. *See In re Am. Bank Note Holographics Sec. Litig.,* 93 F. Supp. 2d 424, 443–44 (S.D.N.Y. 2000) (finding agency relationship based in part upon "allegations of interlocking financial, managerial, and business relationships" between the parent and subsidiary).

*Quaak v. Dexia, S.A.*, 445 F. Supp. 2d 130, 144 (D. Mass. 2006).[7]

In *Quaak*, where the court ultimately found that an agency relationship existed between a parent and its subsidiary, the parent owned 100% of its subsidiary's shares, exercised complete control over its day-to-day operations by placing a member of the parent's executive committee as the head of the subsidiary, required the subsidiary to seek parent approval of any significant actions, and was located in the same building, used the same branding, and operated under uniform policies as the subsidiary. *See id.* The Third Amended Complaint, on the other hand,

---

[7] Maine law applies to this matter. *See* Restatement (Second) of Conflict of Laws § 291 (Am. Law. Inst. June 2021 Update). However, the parties have not identified any Maine law regarding agency in the parent/subsidiary context. Accordingly, I look to persuasive authority.

does not paint the same picture of heavy-handed control of CMP by Avangrid.  While the Third Amended Complaint alleges that Avangrid wholly owns CMP, processed its finances, and cooperated in the implementation of SmartCare, it alleges very little about Avangrid's level of control over CMP.   Ultimately, the Third Amended Complaint fails to allege such an "interlocking of financial, managerial, and business relationships" as to render CMP an agent of Avangrid.  *Quaak*, 445 F. Supp. 2d at 144.

Accordingly, I conclude that all state law claims against Avangrid must be dismissed.  Because I reach this conclusion, I do not address the additional arguments raised regarding the state law claims against Avangrid.  I now turn to the other Defendants' arguments regarding the Plaintiffs' state law claims.

## C.    Unjust Enrichment

The Third Amended Complaint alleges a claim for unjust enrichment collectively against the "corporate defendants."  ECF No. 44 ¶¶ 281, 283-84.

"To establish a claim for unjust enrichment, a party must prove (1) that it conferred a benefit on the other party; (2) that the other party had appreciation or knowledge of the benefit; and (3) that the acceptance or retention of the benefit was under such circumstances as to make it inequitable for it to retain the benefit without payment of its value."  *Howard & Bowie, P.A. v. Collins,* 2000 ME 148, ¶ 13, 759 A.2d 707, 710 (internal quotation marks omitted).

"Unjust enrichment describes recovery for the value of the benefit retained *when there is no contractual relationship,* but when, on the grounds of fairness and justice, the law compels performance of a legal and moral duty to

pay." *Lynch v. Ouellette,* 670 A.2d 948, 950 (Me. 1996) (quoting *A.F.A.B., Inc. v. Town of Old Orchard Beach*, 639 A.2d 103, 105 n.3 (Me. 1994) (emphasis added)). Therefore, "the existence of a contractual relationship precludes recovery on a theory of unjust enrichment." *Stine v. Bank of Am., N.A.*, No. 2:16-CV-109-GZS, 2016 WL 5135607, at *5 (D. Me. Sept. 21, 2016) (alterations omitted) (quoting *Nadeau v. Pitman*, 731 A.2d 863, 867 (Me. 1999)).

Here, CMP and Iberdrola both argue that the binding terms and conditions of a contract govern the dispute between the parties and therefore preclude recovery on an unjust enrichment theory.  I first address this argument as to CMP, and then as to Iberdrola.

### 1.   CMP

The existence of a contractual relationship between CMP and the Plaintiffs is not in doubt.  The Third Amended Complaint states that "CMP enters into a contractual relationship with its customers when it renders services to customers." ECF No. 44 ¶ 287.  CMP agrees that "a PUC-approved set of terms and conditions . . . governs the relationship between CMP and [the] Plaintiffs."  ECF No. 128 at 15.

With respect to the unjust enrichment claim against CMP, the Plaintiffs agree that they cannot recover on both their breach of contract and their unjust enrichment claims; rather they argue that they are entitled to plead unjust enrichment in the alternative to their breach of contract claim.  *See Lass v. Bank of Am., N.A.*, 695 F.3d 129, 140 (1st Cir. 2012) ("[I]t is accepted practice to pursue both [breach of contract and unjust enrichment] theories at the pleading stage."); *Workgroup Tech. Partners, Inc. v. Anthem, Inc.,* 2:15-cv-00002-JAW, 2016 U.S. Dist. LEXIS 14007, at *65 (D. Me.

Feb. 3, 2016) ("[T]he notion that a plaintiff may not plead both breach of contract and unjust enrichment in the alternative has no legs." (quotation marks and citation omitted)).  The Defendants argue that, in light of the undisputed contractual relationship between CMP and the Plaintiffs, the unjust enrichment count must be dismissed.

Courts have dismissed unjust enrichment counts in instances where a contractual relationship between the parties is clearly shown.  For instance, in *Riley v. Gilmore*, the Maine Superior Court reasoned that where "the pleadings establish[ed] a contractual relationship between the parties," it was not proper to allow a claim for unjust enrichment to stand as an alternative theory of liability.  No. CV-05-180, 2006 WL 521710, at *1 (Me. Super. Ct. Feb. 1, 2006).  And in *In re Wage Payment Litigation,* the Law Court noted that where "a contractual relationship between [the parties] exists," plaintiffs are "preclude[d] . . . from maintaining a cause of action for unjust enrichment."  2000 ME 162, ¶ 20, 759 A.2d 217, 224.

On the other hand, some courts allow a claim for unjust enrichment to stand even where a contractual relationship between the parties is undisputed.  In *Lass*, for example, the First Circuit noted that "the parties agree that there is a valid contract between them," but nevertheless allowed an unjust enrichment claim to move forward.  695 F.3d at 140.  The First Circuit explained that "the district court [would] be in a better position once the record [wa]s more developed to determine whether the unjust enrichment claim should survive." *Id.* at 141.

As to CMP, it is undisputed that the Plaintiffs and CMP have a contractual relationship and that Plaintiffs, if successful in proving a breach of contract, will have

a basis to recover without any need to resort to unjust enrichment. Further, the Plaintiffs have not put forth any argument as to how the development of the record may alter this conclusion. Accordingly, because there is no sound reason to permit the Plaintiffs to also seek remedies based on unjust enrichment the same will be dismissed as to CMP.

### 2.   Iberdrola

Iberdrola argues that the Plaintiffs' contractual relationship with CMP bars the Plaintiffs from maintaining an unjust enrichment action against Iberdrola.[8] The Plaintiffs do not meaningfully address this argument, nor do they point to any case law—from Maine or any other jurisdiction—addressing the question of whether a parent company may be held liable on an unjust enrichment theory based on its subsidiary's breach of contract. Instead, the Plaintiffs note only that they "did not have a contract with Iberdrola." ECF No. 118 at 31.

In general, a plaintiff may not bring an unjust enrichment action against a parent corporation where the dispute is governed by the plaintiff's express contract with that corporation's subsidiary. *See Baroi v. Platinum Condo. Dev., LLC*, 2012 WL 2847912, at *9 (D. Nev. July 11, 2012); *Regal Ware, Inc. v. Vita Craft Corp.*, 653 F. Supp. 2d 1146, 1151-52 (D. Kan. 2006); *Skidmore, Owings & Merrill v. Canada*

---

[8]   Iberdrola also argues that the Plaintiffs fail to allege that they conferred a direct benefit on Iberdrola, which Iberdrola contends is required pursuant to the Law Court's decision in *Platz Assocs. v. Finley*, and the Maine Superior Court's decision in *Rivers v. Amato*. 2009 ME 55, ¶ 29, 973 A.2d 743, 751; No. CIV. A. CV-00-131, 2001 WL 1736498, at *4 (Me. Super. Ct. June 22, 2001). Because I determine that the existence of a contractual relationship between the Plaintiffs and CMP precludes the Plaintiffs from maintaining their unjust enrichment claim against Iberdrola, I do not decide the extent to which Maine law requires a plaintiff to prove that a direct benefit was conferred on the defendant to recover on the basis of unjust enrichment.

*Life Assur. Co.*, 706 F. Supp. 758, 759 (D. Colo. 1989).  To allow otherwise would ignore the veil of corporate separateness that exists between a parent and its subsidiary, and would result in a parent corporation being potentially liable on an unjust enrichment theory any time its subsidiary breaches a contract.  The general rule is, however, not controlling where there is an allegation that the corporate veil has been pierced.  *See Baroi*, 2012 WL 2847912, at \*9 ("[A] plaintiff may not pursue an unjust enrichment claim against a parent corporation where the plaintiff has an express written contract with a subsidiary *absent a showing of alter ego or some other theory of liability*." (emphasis added)); *Regal Ware*, 653 F. Supp. 2d at 1151-52; *Skidmore*, 706 F. Supp. at 759.

Here, the Plaintiffs have made various arguments that Iberdrola used CMP as its domestic alter ego and/or its agent, albeit not in the context of their unjust enrichment argument.  However, even assuming that CMP was Iberdrola's alter ego and/or its agent in the context of the unjust enrichment claim, I still conclude that the unjust enrichment claim against Iberdrola must be dismissed because the claim against Iberdrola is entirely derivative of the Plaintiffs' breach of contract claim against CMP.  "To pursue unjust enrichment in equity, the plaintiff must lack an adequate remedy at law." *Wahlcometroflex, Inc. v. Baldwin*, 2010 ME 26, ¶ 22, 991 A.2d 44, 49.  Here, the breach of contract claim against CMP provides the Plaintiffs with an adequate remedy at law.  Accordingly, the unjust enrichment claim against Iberdrola is appropriately dismissed.

### D.     Fraud and Misrepresentation

Under Maine law, the elements of fraud are "(1) that the defendant made a false representation, (2) of a material fact, (3) with knowledge of its falsity or in reckless disregard of whether it is true or false, (4) for the purpose of inducing the plaintiff to act in reliance upon it, and (5) the plaintiff justifiably relied upon the representation as true and acted upon it to the plaintiff's damage." *Rand v. Bath Iron Works Corp.*, 2003 ME 122, ¶ 9, 832 A.2d 771, 773.  Allegations of fraud are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Ultimately, to state a claim for fraud or misrepresentation, the pleader "must state the who, what, where, and when of the allegedly misleading representation with particularity." *Ezell v. Lexington Ins. Co.*, 926 F.3d 48, 51 (1st Cir. 2019) (internal quotation marks, alteration, and citation omitted).

All of the Defendants ask this Court to dismiss at least some of the Plaintiffs' fraud claims against them.  Iberdrola and CMP both contend that the Plaintiffs have failed to meet the heightened pleading standard for fraud.  Herling raises arguments distinct to the allegations regarding his 2018 statements.  I address Iberdrola's argument first, followed by the arguments of CMP and Herling.

#### 1.     Iberdrola

Iberdrola contends that the Plaintiffs cannot meet the heightened pleading standard for fraud because the Third Amended Complaint fails to allege that Iberdrola—as opposed to CMP and/or Herling—made any representations to them,

fraudulent or otherwise.  The Plaintiffs do not argue that the Third Amended Complaint names Iberdrola in particular with respect to its fraudulent misrepresentation claim—indeed, it does not.  Rather, the Plaintiffs argue that their fraud claim "thoroughly implicates Iberdrola under agency principles," and that "the other Defendants' false claims about the accuracy of CMP billing statements and of the SmartCare system are fairly attributable to Iberdrola, as they were acting as Iberdrola's agents in Maine throughout the SmartCare project." ECF No. 118 at 34-35.

As noted above, an agency relationship may exist absent a formal agreement where there are "allegations of interlocking financial, managerial, and business relationships" between the parent and subsidiary. *Quaak*, 445 F. Supp. 2d at 144 (quoting *In re Am. Bank Note Holographics Sec. Litig.,* 93 F.Supp.2d at 443–44).

The Plaintiffs do not allege that an agency agreement between Iberdrola and CMP existed, but rather that Iberdrola and CMP "have interlocking financial, managerial, and business relationships."  ECF No. 118 at 35.  The Plaintiffs cite *Quaak*—discussed above in connection to the state law claims against Avangrid—for the proposition that these interlocking relationships between Iberdrola and CMP/Avangrid demonstrate an agency relationship.

This case presents a closer call than *Quaak*.  It does not appear, at least at this juncture, that Iberdrola ran the "day-to-day" operations of CMP/Avangrid.  However, the Plaintiffs have made allegations that Iberdrola "exercised significant influence" over CMP/Avangrid, ECF No. 44 ¶ 59, and that SmartCare was implemented by CMP/Avangrid "at the direction of Iberdrola," *id.* ¶ 69.  The Third Amended

31

Complaint alleges that the SmartCare rollout in Maine was led by a team that consisted of both Iberdrola employees located in Spain and "Iberdrola employees placed in [Avangrid's] New Gloucester office." *Id.* ¶ 71. It also alleges that there was an "[o]verlap of [k]ey employees at Iberdrola/Avangrid/CMP." *Id.* at 15. The Plaintiffs allege that Iberdrola had a "boots on the ground" approach with respect to CMP/Avangrid, that a "continuous team of people" from Iberdrola's office flowed through Avangrid's Maine office, and that "[t]he Iberdrola team instructed corporate office employees as to how the businesses, including CMP, should be run." ECF No. 44 ¶¶ 45-46, 48. "[T]he employees working at New Gloucester, Maine knew no distinction" between Iberdrola and CMP/Avangrid. *Id.* ¶ 62. Finally, the Third Amended Complaint alleges that Iberdrola's approval was required for all monetary requests.

While whether an individual has acted as an agent is a question of fact which "may be disproved at a later stage of the proceeding," *Quaak*, 445 F. Supp.2d at 145 (quoting *Foisy v. Royal Maccabees Life Ins. Co.*, 356 F.3d 141, 150 (1st Cir. 2004)), taking the facts in the light most favorable to the Plaintiffs, I conclude that the Third Amended Complaint adequately pleads a fraud claim against Iberdrola, at least to the extent that it states a fraud claim against CMP, which I turn to next.

### 2.    CMP

CMP's argument concerns only Plaintiffs Krainin and Platt.[9] They contend that Krainin and Platt have not pleaded that they made any payment on an incorrect

---

[9] CMP concedes that the other three named Plaintiffs adequately state a claim for fraud.

bill, and that they have therefore failed to plead detrimental reliance on a statement that they believed to be true.

With respect to Platt, the Third Amended Complaint alleges that "[i]n December 2017, due to CMP's misrepresentations in the bills it sent to the Platt family, Mr. Platt's wife called CMP to pay part of the incorrect $700 bill ($400) and to request a payment plan for the remaining balance." ECF No. 44 ¶ 189. It also alleges that in late May of 2018, Platt's wife made a $400 payment to CMP to avoid disconnection, but that the Platts later stopped the payment, and that a CMP representative later confirmed that no payment had been made on the family's account since December.

With respect to Krainin, the Third Amended Complaint details the electricity bills that she received beginning in February 2019, which were unexpectedly high. It states that "[d]espite her misgivings, and in part due to Douglas Herling's January 2019 letter, Ms. Krainin believed that she needed to pay the bills as presented." *Id.* ¶ 214. It also states that "[f]rom September, 2017 to the present, Ms. Krainin and her family have been overbilled at least $1,600." *Id.* ¶ 236. The Third Amended Complaint alleges that sometime after April 26, 2019, Krainin was advised by a CMP employee not to pay any portion of her disputed bill. *Id.* ¶ 234.

The claims of both of the named Plaintiffs satisfy the particularity standard. As to Platt, the Third Amended Complaint alleges that he and his wife paid $400 to CMP in December 2017 in reliance on a bill that contained false or misleading statements. While CMP argues that "[i]t would seem indisputable that []Platt has in fact underpaid the amounts due," ECF No. 128 at 17, I cannot reach that conclusion

based on the facts alleged in the Third Amended Complaint alone. As to Krainin, the Third Amended Complaint alleges that she was overbilled beginning in September 2017, and that she believed she needed to pay the bills. While, with respect to Krainin, the Third Amended Complaint does not specifically use the phrase, "she paid the bills," this can fairly be implied from the allegation that she was overbilled but believed she needed to pay.[10] Therefore, the Third Amended Complaint adequately pleads a fraud claim by Krainin and Platt against CMP.

### 3.   Herling

Herling makes two separate arguments with respect to the fraud claim alleged against him. First, he argues that the Plaintiffs fail to plead reliance on his statements in the newspapers in 2018 because none of the Plaintiffs allege seeing those statements. Second, he argues that the Plaintiffs cannot base a fraud claim on the letter sent by Herling to CMP customers in 2019 because the Liberty audit was publicly available,[11] the statements about the audit in the letter were accurate, and only two of the Plaintiffs allege seeing the letter. The Plaintiffs argue that they "justifiably relied on any number of the false representations that were a part of" a scheme to mislead CMP customers, and that they "do not need to tether their reliance

---

[10] The Plaintiffs also submit a supplemental declaration from Krainin indicating that she made numerous payments in 2018 and 2019. CMP argues that the Court may not consider this document, but they do not specifically dispute its authenticity. Courts may consider supplemental documents if the parties do not dispute the authenticity of those documents. *Watterson*, 987 F.2d at 3. While it seems likely that CMP could easily discover whether the document is accurate given the fact that the document reflects payments made to CMP, I do not determine whether the document can be considered, as I conclude that Krainin's fraud claim against CMP/Avangrid is sufficient even without considering the document.

[11] Because I determine that the statements in the letter were accurate, I do not address the public availability argument.

to each of Defendant Herling's false statements that were also a part of the scheme." ECF No. 146 at 4-5.

The fraud claim against Herling cannot stand based on his statements to the newspaper, which none of the Plaintiffs have alleged that they have read.[12]  Plaintiffs Levesque, Decker, Platt also do not allege that they received or relied on the letter sent by Herling in 2019.  Therefore, I conclude that the fraud claims against Herling by Levesque, Decker, and Platt must be dismissed for these reasons.  Plaintiffs Krainin and Trussell both allege that they received Herling's 2019 letter, but only Krainin alleges that she was affected by the letter.  I therefore conclude that Trussell's fraud claim against Herling must also be dismissed.

As to Krainin, the Third Amended Complaint alleges that she "believed she was being overcharged" but that, "[d]espite her misgivings, and in part due to Douglas Herling's January 2019 letter, [she] believed that she needed to pay the bills."  ECF No. 44 ¶¶ 213-214.  Herling argues that even if Krainin does sufficiently plead that she relied on his letter, her claim must fail because the statements in the letter are accurate.

The Plaintiffs take issue with two statements in Herling's January 2019 letter. First, Herling's statement that the Liberty audit "concluded that all systems from meter to bill are working as intended and bills are accurate," *id.* ¶ 331, and second, Herling's statement that the Liberty audit concluded that CMP failed to dedicate enough "staff, training[,] or management oversight," *id.* ¶ 340.  The Third Amended

---

[12]  Herling's statements to the newspapers—issued before the Liberty audit—focus on CMP's own investigation into SmartCare's billing issues.  The Third Amended Complaint makes no allegations regarding this internal investigation that explain the alleged falsity of Herling's statements.

Complaint alleges that the first statement is false, and that the second statement falsely implies that the Liberty audit found no other shortcomings.

Contrary to the Plaintiffs' assertions, the first statement—that the Liberty audit concluded that "all systems from meter to bill are working as intended and bills are accurate," *id.* ¶ 331—is not inaccurate. The Liberty audit found that "CMP's meters produce accurate measurements of customer usage. Its meter-related databases and communications systems accurately, completely, and timely collect and store usage, and transmit it accurately, completely, and timely to the billing systems of CMP's customer information system, SmartCare. The meters, systems, and databases have done so since November 1, 2017." ECF No. 14-6 at 15. It further found that "billing is on the whole accurate and has been since November 1, 2017," despite some inexplicable billing amounts and delays. *Id.* at 18. Herling's assertion that the Liberty audit "concluded that all systems from meter to bill are working as intended and bills are accurate" does not conflict with the language of the Liberty audit itself. ECF No. 44 ¶ 331. While the Liberty audit—a publicly available document—goes into greater detail regarding certain inexplicable billing amounts, Herling's broad assertion that the Liberty audit concluded that SmartCare is working as intended and producing accurate bills does not contradict the Liberty audit's overall findings.

Herling's second statement—that the Liberty audit concluded that CMP failed to dedicate enough "staff, training[,] or management oversight," *id.* ¶ 340—is also an accurate representation of the audit. While the Plaintiffs argue that this statement implies that the Liberty audit found no other shortcomings with the SmartCare

system, I do not conclude that Herling had an affirmative duty to explain every finding made by the Liberty audit. This is particularly true where the audit's overall conclusion was that the SmartCare system accurately measures energy usage and that CMP's bills were accurate on the whole.

For the preceding reasons, the Plaintiffs' fraud claim against Herling must be dismissed.[13]

## E.   Violation of 35-A M.R.S.A. § 1501

The Plaintiffs allege that CMP violated 35-A M.R.S.A. § 1501, which states that "[i]f a public utility violates this Title, causes or permits a violation of this Title or omits to do anything that this Title requires it to do it may be liable in damages to the person injured as a result. Recovery under this section does not affect a recovery by the State of the penalty prescribed for the violation."

In a decision dated December 7, 2020, Justice Michaela Murphy of the Maine Superior Court's Business and Consumer Docket determined that section 1501 does not "provid[e] a freestanding cause of action. It simply confirms that individual persons are not deprived of pursuing common law causes of action . . . ." *Deane v. Central Maine Power Co.*, No. BCD-CV-20-20, Order on Defendant's Motion to Dismiss, slip op. at 14 (Me. Super. Ct. Dec. 7, 2020) (ECF No. 128-1). Justice Murphy drew this conclusion from a statement by the Law Court in *Smith v. Central Maine Power Co.*, which noted that "[b]y statutes and by common law, violation of a safety

---

[13] The Plaintiffs seek leave to amend the Third Amended Complaint to add one or more CMP customers as plaintiffs who have expressly reviewed Herling's statements and made a payment in reliance on those statements. Because I conclude that Herling's statements (both to the newspapers and in the 2019 letter) were not inaccurate—and because, therefore, the proposed amendments would not change the outcome on this issue—I deny the Plaintiffs' request.

statute or regulation may be evidence of negligence but does not constitute negligence per se" and cited section 1501 as an example.  2010 ME 9, ¶ 10 n.3, 988 A.2d 968. Justice Murphy noted that a reading of section 1501 as creating an individual cause of action would render the Law Court's statement in *Smith* superfluous.  *Deane* at 14.

In "endeavor[ing] to predict how [a state's highest] court would likely decide [a] question," a "federal court should consult the types of sources that the state's highest court would be apt to consult, including . . . decisions of lower courts in the state." *Butler v. Balolia*, 736 F.3d 609, 613 (1st Cir. 2013).  While *Deane* is not binding Law Court precedent, it is a recent, on-point decision from a specialized Maine business and consumer court.  Accordingly, I adopt Justice Murphy's reasoning, and conclude that the section 1501 claims against CMP must be dismissed because the statute does not provide a cause of action.

## F.    Violation of RICO

CMP, Avangrid, and Herling contend that the RICO claim against them must be dismissed for a number of reasons.[14]  First, they argue that a RICO defendant must be "distinct" from the RICO enterprise.  Second, they argue that the Plaintiffs failed to plead facts from which the Court could find that CMP, Avangrid, or Herling "conducted" the affairs of their corporate parent "through" racketeering activity.[15]  I address each argument in turn.

---

[14]  As noted above, the Plaintiffs have voluntarily dismissed the RICO claim against Iberdrola.

[15]  The Defendants also argue that "[f]or the same reasons that certain Plaintiffs fail to plead injury and reliance in connection with their fraud claim, they fail to allege any injury as required for a RICO claim."  ECF No. 128 at 28.  Because I dismiss the RICO claim on other grounds, I do not address this argument further.

### 1.    Distinctness

Under section 1962(c) of RICO, it is unlawful for a "person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C.A. § 1962(c). "[I]t is well settled in this circuit that the 'person' identified under § 1962(c) must be distinct from the 'enterprise.'" *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 448 (1st Cir. 2000), *as amended on denial of reh'g* (Dec. 15, 2000).

"This circuit has consistently refrained from adopting a bright line rule that a subsidiary can never be distinct from its parent corporation." *Id.* at 449. Instead, a court must "look to the allegations in the complaint to determine whether the parent's activities are sufficiently distinct from those of the subsidiary at the time that the alleged RICO violations occurred." *Id.* "In most cases, a subsidiary that is under the complete control of the parent company is nothing more than a division of the one entity. Without further allegations, the mere identification of a subsidiary and a parent in a RICO claim fails the distinctiveness requirement." *Id.* "[A] scheme does not implicate RICO merely because it originated with someone connected to a corporation." *Id.*

The Plaintiffs argue that in this case, "CMP and Avangrid . . . used the Iberdrola enterprise to facilitate their overbilling of Maine customers, and their deceptive campaign to cover it up." ECF No. 145 at 14. They contend that "Iberdrola introduced the SmartCare system to CMP/Avangrid," and "instructed what system to use and designed and implemented the system," and that "CMP/Avangrid then managed the customer interfacing and many on-the-ground details." *Id.* Ultimately,

the Plaintiffs argue that CMP/Avangrid and Herling are distinct "persons" who used the Iberdrola "enterprise" to facilitate their fraudulent conduct.

The Defendants argue that the distinctiveness requirement is not satisfied in this case because it involves legally separate parent and subsidiary corporate entities carrying on their regular business. They contend that CMP/Avangrid's management of customer interfacing and on-the-ground details is typical of the relationship between electric utilities and their parent companies. Ultimately, they argue that "a plaintiff may not circumvent the distinctness requirement by alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant—that consists, in other words, of a corporate defendant corrupting itself." *U1it4less, Inc. v. Fedex Corp.*, 871 F.3d 199, 206 (2d Cir. 2017) (internal citation and quotation marks omitted).

As the Defendants note, the Plaintiffs have failed to make any concrete allegations that the Iberdrola "enterprise" was distinct from CMP/Avangrid/Herling. In fact, much of the Third Amended Complaint lumps the actions of all of the corporate defendants together, and seems designed to show that Iberdrola used CMP/ Avangrid as extensions of itself to implement the SmartCare project. Given the persistent allegations throughout the Third Amended Complaint and throughout the pleadings relating to the motions to dismiss that Iberdrola was a parent company highly involved in the workings of its subsidiary, it is illogical to conclude that Iberdrola and CMP/Avangrid were separate entities for the purposes of RICO. Thus,

the RICO claim must be dismissed on the grounds that it does not allege a "person" distinct from the alleged "enterprise."[16]

### 2.    "Conducted" Affairs "Through" Racketeering Activity

The Defendants also argue that the RICO claims must fail because the Plaintiffs do not allege that CMP, Avangrid, or Herling "participate[d] in the operation or management of the enterprise itself," which, as the Supreme Court has explained, is necessary to meet the requirement that a person "conduct[ed] or participat[ed] . . . in the conduct of such enterprise's affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (quoting 18 U.S.C.A. § 1962(c)).  As the Defendants note, the Third Amended Complaint does not allege that CMP, Avangrid, or Herling participated in the operation or management of Iberdrola, but rather that Iberdrola controlled the affairs of CMP.  The Plaintiffs counter that the Supreme Court does not require "significant control over or within an enterprise," but they acknowledge that the Court does require participation in the operation and management of the enterprise.  ECF No. 145 at 15 (quoting *Reves*, 507 U.S. at 179 n.4).

I conclude that the Plaintiffs do not sufficiently allege participation in the operation or management of the enterprise by CMP, Avangrid, or Herling.  The Plaintiffs are clear that they believe Iberdrola is the alleged enterprise.  The Third Amended Complaint alleges that CMP/Avangrid participated heavily in the SmartCare program, but that project is not the same as the Iberdrola "enterprise."

---

[16] While the Plaintiffs contend, in essence, that Iberdrola and CMP/Avangrid/Herling became separate entities following SmartCare's go-live when CMP/Avangrid began managing the response to SmartCare's alleged issues, this argument is not borne out in the Third Amended Complaint, which seeks to hold all corporate Defendants—including Iberdrola—liable for the allegedly fraudulent aspects of this campaign, including the alleged post-go-live conduct.

CMP/Avangrid's participation in the SmartCare rollout does not mean that CMP/Avangrid were participating in the operation or management of Iberdrola.

Accordingly, I conclude that the RICO claims against CMP, Avangrid, and Herling must be dismissed.

## V. CONCLUSION

For the foregoing reasons, Iberdrola's Motion to Dismiss for Lack of Personal Jurisdiction (ECF No. 84) is **DENIED**.  Iberdrola's Motion to Dismiss for Failure to State a Claim (ECF No. 84) is **GRANTED** as to Count I, **DENIED** as to Count IV, and **DENIED AS MOOT** as to Counts III and VI, which have been voluntarily dismissed.  CMP and Avangrid's Motion to Dismiss for Failure to State a Claim (ECF No. 128) is **GRANTED** as to Count I, **GRANTED** with respect to Avangrid only as to Count II, **GRANTED** as to Count III, **GRANTED** with respect to Avangrid and **DENIED** with respect to CMP as to Count IV, and **GRANTED** as to Count VI. Herling's Motion to Dismiss for Failure to State a Claim (ECF No. 129) is **GRANTED** as to Counts V and VI.  Iberdrola's Response to Plaintiff's Notice of New Developments (ECF No. 126) and the Plaintiffs' Unopposed Motion for Leave to File in Excess of the Page Limit (ECF No. 144) are **DENIED AS MOOT.**

**SO ORDERED.**

**Dated:  August 6, 2021**

_____
**/s/ JON D. LEVY**
**CHIEF U.S. DISTRICT JUDGE**